Dennis PERRY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–1012–CR–774.

Court of Appeals of Indiana.

Aug. 22, 2011.

Patricia Caress McMath, Marion County Public Defender, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, James E. Porter, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Dennis Perry appeals his convictions for strangulation, criminal mischief, and possession of cocaine. Perry was accused

of assaulting his ex-girlfriend, N.D. After the alleged assault, N.D. sought assistance from police and was brought to the hospital for examination. She told her examining nurse that she had been sexually assaulted and strangled. She further identified Perry as the assailant. N.D.'s statements were admitted at trial via a medical record prepared by the examining nurse. N.D. did not testify. Perry argues that N.D.'s statements constituted inadmissible hearsay and that their admission violated his Sixth Amendment right to confrontation. We conclude that N.D.'s material statements—those detailing her physical attack and identifying her attacker—were admissible pursuant to the medical diagnosis exception to the hearsay rule. We further conclude that N.D.'s statements were nontestimonial under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and thus did not implicate Perry's confrontation rights. However, at trial, the State also elicited that Perry had been arrested and charged in connection with five prior domestic disturbances involving N.D. We conclude that the trial court erred by admitting this prior misconduct evidence, as it consisted only of arrests and charges. We further conclude that the error was not harmless and warrants reversal, though we find sufficient evidence to sustain Perry's convictions such that retrial would not violate double jeopardy. Accordingly, we reverse and remand.

### Facts and Procedural History

One morning at approximately 7 a.m., N.D. arrived at an Indianapolis police station panicked and hysterical. She had a visible scratch on her shoulder and was looking behind her back repeatedly. N.D. told the desk attendant that she had been held against her will and that she was scared. N.D. provided the name and a description of her assailant as well as his address and a description of his truck. The attendant radioed for assistance. Parked outside the station was N.D.'s rental car. It was severely dented and the windshield was shattered.

Officer Shay Foley arrived at the station within three minutes of receiving the dispatch. N.D. was crying and shaking. She told Officer Foley that she had been raped. Officer Foley brought N.D. to an interview room. N.D. calmed down within fifteen minutes and relayed a sequence of events that had occurred the previous night and that morning. Officer Foley observed injuries on N.D.'s neck and called for medics.

Officer Mark Euler also received the initial dispatch and located a truck matching a description of the suspect's about two or three minutes later. Officer Euler initiated a stop and identified Perry as the driver. Officer Euler instructed Perry to exit the vehicle. There were no other passengers. Perry did not feel well, as his colostomy bag had ruptured. A medic responded and brought Perry to Wishard Hospital.

Officer Ted Brink inventoried Perry's truck. The vehicle contained several bags of clothes. A plastic bag in the bed of the truck contained a pair of men's jeans. Officer Brink found a substance later identified as crack cocaine inside the jeans pocket. The cocaine totaled approximately ten grams.

N.D. was transported to Methodist Hospital and examined by emergency/forensic nurse Natalie Calow. Nurse Calow later described her protocol as follows:

> First the patient arrives at the ER. Usually a detective brings them or a victim's assistant does. I meet with them. We just do a quick medical history and vital

signs. And the social work[er] meets with them. When we meet with them we're assessing the patient at first, her demeanor, any—I need to know her state of mind. Any medical history ... if she knows the assailant's medical history too it's important. That guides me, the treatment plan that I'm going to do. Where I need to look for injuries. I get the history of the assault too with the social work[er] present. We both do. Then after I get all the history ... I set up my room 'cause there's certain swabs we take, certain pictures we take depending on what she tells me. And the social work[er] stays, makes sure she does some counseling with the patient. I go back in, I tell the patient everything I'm going to do about the exam. So, then I take the patient into the exam room and then I just start my head to toe assessment. I check the patient over straight head from toe to see if any abrasions that the patient might not know about or does know about and ask them what happened there. I photograph them as I'm going down. And then I do the speculum exam at the very end. And then afterwards I offer them treatment for any STDS they might have been exposed to, HIV and then I make sure they have a safe place to go. And call for their ride or help them with social work and follow-up counseling I help them with.

Tr. p. 111–12. Nurse Calow followed the foregoing protocol in treating N.D.

During the exam, N.D. told Nurse Calow that she had been sexually assaulted and strangled inside her car. N.D. identified Perry, her ex-boyfriend, as the assailant. Nurse Calow observed various injuries to N.D.'s neck, ears, and back. The neck injuries included a "ligature mark" which N.D. said was caused by a necklace. Nurse Calow took pictures of N.D.'s injuries. She also conducted body and genital

swabs for DNA and collected N.D.'s underwear, all of which were sent to the crime lab for analysis. Nurse Calow completed a medical report which documented N.D.'s treatment, relayed N.D.'s account of the incident in question, and identified Perry as the suspected perpetrator.

Analysts later determined that DNA samples from N.D.'s neck and genitals matched Perry's DNA profile.

The State charged Perry with Class B felony rape, Class C felony criminal confinement, Class D felony strangulation, Class C felony possession of cocaine, and Class D felony criminal mischief for damaging N.D.'s rental car.

N.D. did not testify at trial, but Nurse Calow and the investigating officers did. Nurse Calow's examination report was admitted into evidence over the defense's hearsay objection.

Perry testified in his defense. He stated that he was involved with N.D. for six years, and he admitted that he had sex with her on the night in question. Perry maintained, however, that he exited N.D.'s rental car, N.D. tried to run him over, and out of fear he began striking the car with a tire iron. Perry further testified that the truck he was driving belonged to his daughter, and he claimed that a man named James Ward used the truck periodically. On cross-examination, the State elicited that Perry had been arrested and charged on five prior occasions for domestic disturbances involving N.D.

Perry was convicted of strangulation, possession of cocaine, and criminal mischief. The jury deadlocked on rape and criminal confinement. Perry now appeals.

**Discussion and Decision**

Perry raises several issues, only three of which we find necessary to address: (I) whether the trial court erred by admitting

Nurse Calow's examination record, (II) whether the court erred by admitting evidence of Perry's prior arrests for domestic violence involving N.D., and (III) whether the evidence is sufficient to sustain Perry's convictions such that retrial would not offend double jeopardy.[1]

## I. Admission of Nurse Calow's Medical Record and N.D.'s Statements Therein

Nurse Calow completed a medical record in connection with her examination of N.D. State's Ex. 6A. The report identified "Dennis [P]erry" as the suspected assailant. *Id.* It relayed N.D.'s statements that Perry "grabbed her around the neck" and that N.D. experienced pain from an "attempted strangulation." *Id.* The report included the following narrative:

Pt states she was going to a gas station on the east side to meet up with the assailant's cousin Tracey at around 11 pm. When she got to the gas station she didn't see Tracey but Mr. [P]erry jumped in the passenger's side of the car. Mr. [P]erry then ordered her to drive him to a friend's house to pick up some dope and then to a nearby Taco Bell. Pt states she is afraid of Mr. [P]erry so she did as he asked because she didn't want to get hurt. He then ordered her to drive to 1402 S. Linden St in the back of the house. The car [N.D.] was driving at the time was a rental car. She said they sat in the car talking about their past relationship troubles when all at once Mr. [P]erry said "I want to fuck". Pt said no due to her being on her period now. Mr. [P]erry then grabbed her by the waist and pulled her on top of him. She kept telling him no then Mr. [P]erry ordered her to play with his penis. Mr. [P]erry

then stated he still wanted to fuck. She then asked Mr. [P]erry to put on a condom thinking this would throw him off due to her knowing he doesn't like to wear a condom. He then pulled her pants off and told her he wasn't going to wear a condom. He then ordered her to take out her tampon which she did and threw it on the floor of the car. He then said he was about to "nut" and pulled her on top of him so that his penis was inside her. She then stated he was inside for about 10 seconds when he ejaculated in her. She then got back over into the drivers seat. Mr. [P]erry the[n] reached for his pot in the floorboard and started asking who[se] car she was driving. He reached over and started strangling her with his hands. Mr. [P]erry kept asking her about the car and then he let go and seemed to be looking for the paperwork for the car. He then got out of the car and walked around to the drivers seat. She then moved to the passenger seat. He got in the drivers seat and reached over to strangle her some more. He finally quit and [N.D.] jumped in the back seat of the car to get away from him. Mr. [P]erry then drove to a gas station to get some cigarettes while [N.D.] laid in the back seat of the car. He then drove them back to Linden St again. She states he was falling asleep in the car when she tried to grab the car keys but he awoke. That is when the assailant noticed his colostomy bag had ruptured and he got out of the car. She then locked the car and tried to back up when Mr. [P]erry came at her with a tire iron. He tried to break the drivers side window but could not then he shattered the windshield.

<hr>

1. Perry also argues that the trial court erred in refusing a tendered instruction on constructive possession of narcotics. Because we reverse, we do not reach Perry's instructional issue.

[N.D.] then drove off and went to the nearest police station.

*Id.*

The report's aftercare information indicated that N.D. had been tested for "legal evidence," pregnancy, and HIV, and that she was given medication to reduce the risk of contracting gonorrhea, chlamydia, and other sexually transmitted diseases. It recommended that she follow up in various intervals for a general health examination and additional testing.

The record also included two consent forms, in which N.D. initialed the following statements: "I authorize this hospital to release a completed copy of this application/report with any evidence of sexual assault, including, but not limited to, my clothing, laboratory specimens and medical records of this date, to . . . IMPD . . . ."; "I authorize this hospital to contact law enforcement authorities on my behalf.'"; "I hereby consent to a physical examination by a specially trained Sexual Assault Nurse Examiner to discover and preserve evidence of the assault. I understand that the report of the examination and any evidence or specimens collected will be released to law enforcement authorities."; and "I understand that collection of evidence may include photographing injuries and that these photographs may include the genital area. Knowing this, I consent to having photographs taken for use as evidence." *Id.*

During Nurse Calow's testimony, the State offered the medical record into evidence. Perry objected, arguing that N.D.'s statements within the record constituted inadmissible hearsay. Perry did not raise an objection on Sixth Amendment grounds.

The trial court admitted the record over objection, though the narrative portion was redacted to read as follows:

Mr. [P]erry then ordered her to drive him to a friend's house. Pt states she is afraid of Mr. [P]erry so she did as he asked because she didn't want to get hurt. He then ordered her to drive. Mr. [P]erry said "I want to fuck". Pt said no due to her being on her period now. Mr. [P]erry then grabbed her by the waist and pulled her on top of him. He then ordered her to take out her tampon. [H]e was about to "nut" and pulled her on top of him so that his penis was inside her. She then stated he was inside for about 10 seconds when he ejaculated in her. He reached over and started strangling her with his hands. He got in the drivers seat and reached over to strangle her some more. Mr. [P]erry then drove to a gas station to get some cigarettes while [N.D.] laid in the back seat of the car. He then drove them back[.] That is when the assailant noticed his colostomy bag had ruptured and he got out of the car. [ ] Mr. [P]erry came at her with a tire iron. He tried to break the drivers side window, shattered the windshield. [N.D.] then drove off and went to the nearest police station.

State's Ex. 6.

Perry argues that the trial court erred by admitting Nurse Calow's medical record and N.D.'s statements relayed therein. Perry maintains that (A) the statements constituted inadmissible hearsay and (B) their admission violated his right to confrontation under the Sixth Amendment.

### A. Hearsay Claim

The first issue is whether the medical record and N.D.'s statements within constituted inadmissible hearsay under the rules of evidence.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Ind. Evidence Rule 801(c). Hearsay is not admissible except as provided by law or by other court rules. Ind. Evidence Rule 802. Hearsay within hearsay is admissible if each part of the combined statements conforms with a hearsay exception. Ind. Evidence Rule 805.

This case involves multiple hearsay under Rule 805—that is, N.D. made several out-of-court statements to Nurse Calow, and Nurse Calow prepared an out-of-court medical record relaying what N.D. told her. Both N.D.'s statements and Nurse Calow's record were offered at trial for their truth. Accordingly, we analyze each set of statements in turn to determine their admissibility under an applicable hearsay exception.

1. Statements by N.D. to Nurse Calow

We first address the admissibility of N.D.'s out-of-court statements to Nurse Calow.

Indiana Evidence Rule 803(4) sets forth the "medical diagnosis exception" to the hearsay rule. Rule 803(4) provides for the admissibility of statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The rationale underlying the exception is that a declarant's self-interest in seeking treatment reduces the likelihood that she will fabricate information that she provides to those who treat her. *McClain v. State*, 675 N.E.2d 329, 331 (Ind.1996).

■ In determining the admissibility of hearsay under Rule 803(4), courts evaluate (1) whether the declarant's motive was to provide truthful information to promote diagnosis and treatment and (2) whether the content of the statement is such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment. *In re Paternity of H.R.M.*, 864 N.E.2d 442, 446 (Ind.Ct.App.2007).

■ Statements attributing fault or establishing a perpetrator's identity are typically inadmissible under the medical diagnosis exception, as identification of the person responsible for the declarant's condition or injury is often irrelevant to diagnosis and treatment. *Beverly v. State*, 801 N.E.2d 1254, 1259 (Ind.Ct.App.2004), *trans. denied.*

However, we have noted that in cases involving child abuse, sexual assault, and/or domestic violence, courts may exercise their discretion in admitting medical diagnosis statements which relay the identity of the perpetrator. *See Nash v. State*, 754 N.E.2d 1021, 1024–25 (Ind.Ct.App. 2001); *see also Dowell v. State*, 865 N.E.2d 1059 (Ind.Ct.App.2007), *summarily aff'd in relevant part*, 873 N.E.2d 59 (Ind.2007). As we recognized in *Nash:*

All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser. The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household. In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes "reasonably pertinent" to the victim's proper treatment.

754 N.E.2d at 1024–25 (quoting *United States v. Joe*, 8 F.3d 1488, 1494–95 (10th Cir.1993)).

"The extent to which a statement as to cause is pertinent to diagnosis or treatment rests within the discretion of the trial judge, who may consider the health care provider's testimony in making that determination." 13 Robert Lowell Miller, Jr., *Indiana Practice: Indiana Evidence* § 803.104 (3d ed.2007) (citations omitted); *see also* Ind. Evidence Rule 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the Court[.]"); 21A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5053.3 (2d ed. 2005) ("The judge determines the preliminary facts regarding the hearsay exceptions in Rule 803[.]").

■ Here we conclude that the material statements N.D. made to Nurse Calow— namely, those describing the physical attack and identifying Perry as the assailant—were admissible pursuant to Rule 803(4). N.D.'s statements indicating she was "grabbed . . . around the neck" and strangled were pertinent to the diagnosis and treatment of her physical injuries. And N.D.'s identification of her assailant was pertinent to potential treatment for HIV or other sexually transmitted diseases, relevant to any psychological counseling for domestic abuse, and significant to medical personnel in deciding how to discharge their patient. As Nurse Calow explained, "When we meet with them we're assessing the patient at first, her demeanor, any—I need to know her state of mind. Any medical history . . . if she knows the assailant's medical history too it's important. That guides me, the treatment plan that I'm going to do. Where I need to look for injuries. I get the history of the assault too . . . ." We acknowledge that additional statements in the medical

record may have exceeded the scope of the medical diagnosis exception and were left unredacted. For example, N.D. said that Perry "ordered her to drive him to a friend's house" and "drove to a gas station to get some cigarettes." We conclude, however, that any error in the admission of these nonmaterial statements was harmless. *See* Ind. Evidence Rule 103; *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009) ("No error in the admission of evidence is grounds for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties."); *Wales v. State*, 768 N.E.2d 513, 521 (Ind.Ct.App.2002) ("A reversal may be obtained only if the record as a whole discloses that the erroneously admitted evidence was likely to have had a prejudicial impact upon the mind of the average juror, thereby contributing to the verdict.").

### 2. Record Prepared by Nurse Calow

The next question concerns the admissibility of the medical record itself.

Indiana Evidence Rule 803(6) sets forth the hearsay exception for "records of regularly conducted business activity." Rule 803(6) provides for the admission of any "memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

Among those business records routinely held admissible under Rule 803(6) are medical records. *See In re Termination of Parent–Child Relationship of E.T.,* 808 N.E.2d 639, 645 n. 4 (Ind.2004); *see also Richardson v. State,* 856 N.E.2d 1222, 1230 (Ind.Ct.App.2006), *trans. denied; Nash,* 754 N.E.2d at 1026.

To be sure, the hearsay rules exclude "investigative reports by police and other law enforcement personnel" when offered against the accused in criminal cases. *See* Ind. Evidence Rule 803(8). "[T]he reason for this exclusion is that observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases." *Fowler v. State,* 929 N.E.2d 875, 879 (Ind.Ct.App.2010) (quoting S.Rep. No. 93–1277, at 17 (1974), 1974 U.S.C.C.A.N. 7051, 7064), *trans. denied.*

■ However, we do not read "police and law enforcement personnel" to encompass treating physicians or nurses, even where such medical personnel may act in cooperation with law enforcement authorities. *Cf. Nash,* 754 N.E.2d at 1026 (record from nurse's examination of victim held admissible); 30B Michael H. Graham, *Federal Practice & Procedure* § 7047 (Interim ed.2006) (noting that ambulance driver's report would be admissible on its face); *United States v. Rosa,* 11 F.3d 315, 331–33 (2d Cir.1993) (medical examiner not "law enforcement personnel" under 803(8)).

■ We conclude that N.D.'s medical record and Nurse Calow's observations relayed therein were admissible pursuant to Rule 803(6). Nurse Calow created the record in connection with her contemporaneous evaluation of N.D. and in the course of the hospital's regular business activity of consulting patients and documenting treat-ment. We therefore find no error in its admission.

### B. Confrontation Claim

■ Perry next argues that the admission of N.D.'s statements violated his Sixth Amendment right to confrontation. The State responds that Perry's Sixth Amendment claim is waived for failure to raise a corresponding objection at trial. We agree that an evidentiary objection based only on the rules of evidence is not sufficient to preserve a claim premised on the Sixth Amendment. *See Small v. State,* 736 N.E.2d 742, 747 (Ind.2000); *Boatner v. State,* 934 N.E.2d 184, 187–88 (Ind.Ct.App. 2010). However, given our preference for resolving issues on their merits and the potential existence of fundamental error, we choose to address Perry's confrontation claim as raised on appeal.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The right to confrontation guaranteed by the Sixth Amendment is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

In *Crawford v. Washington,* the United States Supreme Court reexamined the history surrounding the Confrontation Clause and concluded that, even where hearsay is deemed admissible under the rules of evidence, if the hearsay is "testimonial" in nature, then the Sixth Amendment bars its admission in criminal trials unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Our analysis of multiple hearsay under *Crawford* proceeds in a stepwise fashion as under the rules of evidence. Or in the words of one court, "the Confrontation Clause principle enunciated in *Crawford* is implicated only if one or more levels of multilevel hearsay involve both a testimonial statement and the unavailability of—and lack of prior opportunity to cross-examine—the declarant *of that statement.* . . . Stated another way, in order for *Crawford* to apply to a multilevel hearsay statement, the two prerequisites to that application—a testimonial statement and an unavailable declarant—must coincide on at least one level." *State v. Ennis,* 212 Or.App. 240, 158 P.3d 510, 518 (2007).

### 1. Statements by N.D. to Nurse Calow

We must determine whether the admission of N.D.'s statements to Nurse Calow violated Perry's confrontation rights—or more specifically, whether N.D.'s statements constituted "testimonial" hearsay which, in the absence of any opportunity to cross-examine N.D., were inadmissible under *Crawford* and the Sixth Amendment.

*Crawford* declined to set forth a clear and comprehensive definition of "testimonial" hearsay, but it identified "various formulations" of the "core class of 'testimonial' statements": (1) ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51–52, 124 S.Ct. 1354.

In *Davis v. Washington,* the Supreme Court refined the meaning of "testimonial" at least within the context of police interrogation and emergency response. 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court, "[w]ithout attempting to produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial," concluded that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* On the other hand, "[s]tatements are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* The Court recently clarified in *Michigan v. Bryant* that determining the "primary purpose" of an interrogation requires an objective evaluation of the circumstances in which the encounter occurs and the statements and actions of the parties:

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had,

as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. —— U.S. ——, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011).

Neither *Davis* nor *Bryant* resolved to what extent their holdings extended beyond the context of police interrogation, *see Bryant,* 131 S.Ct. at 1155 n. 3; *Davis,* 547 U.S. at 823 n. 2, 126 S.Ct. 2266, but lower courts have found *Davis's* "primary purpose" framework applicable outside the realm of explicit police questioning—and more specifically, courts have employed the primary purpose inquiry when evaluating statements by alleged victims to medical personnel, *see, e.g., Clark v. State,* 199 P.3d 1203, 1208 (Alaska Ct.App.2009); *People v. Cage,* 40 Cal.4th 965, 56 Cal. Rptr.3d 789, 155 P.3d 205, 218–219 (2007).

So in assessing whether N.D.'s statements to Nurse Calow were "testimonial" for purposes of the Sixth Amendment, the question is: what, objectively speaking, was the primary purpose of Nurse Calow's examination and N.D.'s statements incident thereto?

One opinion that we find noteworthy and instructive is *State v. Stahl,* 111 Ohio St.3d 186, 855 N.E.2d 834 (2006). In *Stahl,* victim Ann Mazurek was allegedly orally raped by the defendant. 855 N.E.2d at 836. The next day she gave a detailed statement to Officer Amy Ellis describing what happened. *Id.* Officer Ellis transported Mazurek to the Developing Options for Violent Emergencies ("DOVE") unit of an Akron hospital. *Id.* Before examination, Mazurek signed a form which read in pertinent part, "I voluntarily consent to this forensic examination and collection of evidence.... I authorize the release of evidence, information (including protected health information), clothing, colposcope photos, and photography documentation of injuries to a law enforcement agency for

use only in the investigation and prosecution of this crime...." *Id.* at 836–37. Nurse Jenifer Markowitz began her examination by taking a medical and incident history from Mazurek. *Id.* at 837. She documented the incident in her report as follows:

Ann states she went to talk with her boyfriend's boss about giving him his job back. She states she was in his office talking with him and he came around the desk and put his arms around her and patted her back; told her "Let's go take a walk, you'll feel better." She states she protested, but he grabbed his coat and Ann states she thought they were going outside. She states he whispered to her, "I would do anything for you. I'll always help you." She states he walked her out of his office and downstairs. She states she told him she didn't need a walk. She states he took her into an office and started to hug her, telling her, "I'll always help you guys out. You do something to me. I don't know what it is about you." She states he kept hugging her, trying to kiss her mouth. She states she told him no, but he got the door closed and turned the lights down. She states he pushed her into a corner and kept kissing her mouth. She states he told her, "I helped you guys out, you're going to do something for me." She states he moved his hands around her head, then moved one hand to her neck and pushed her down onto her knees. Ann states she hit her head on a piece of furniture when he pushed her down. She states he held her down, unzipped his pants and took his penis out. She states he tried to penetrate her mouth and was able to get it in after rubbing himself in her face and manually masturbating himself. She states he straddled her shoulders and neck and continued to

orally penetrate her until he ejaculated in her mouth, on her face and in her hair. She states he handed her a tissue to clean off with then let her leave without incident.

*Id.* Officer Ellis remained in the room while Nurse Markowitz took the incident history, though she left before the physical examination. *Id.* Nurse Markowitz then began the physical examination of Mazurek, during which she photographed Mazurek's mouth and collected nail scrapings and oral swabbings. *Id.* She used ultraviolet light to identify any bodily fluids still present. *Id.* She also took a napkin from Mazurek's coat pocket that Mazurek had used to wipe her face after the incident. *Id.* Nurse Markowitz then determined whether Mazurek would be in any danger upon discharge and informed her about the importance of follow-up care. *Id.* at 837–38. Mazurek died five weeks later from an unrelated seizure disorder. *Id.* at 838. Stahl was charged with rape and kidnapping, and he moved in limine to exclude Mazurek's out-of-court statements to Nurse Markowitz. *Id.* Stahl argued that the statements constituted testimonial hearsay which, in the absence of any opportunity to cross-examine Mazurek, were inadmissible under *Crawford* and the Sixth Amendment. *Id.* The trial court agreed and granted the motion, *id.,* but the Ohio Court of Appeals and Supreme Court reversed, *see id.* at 836. The Ohio appellate courts found Mazurek's statements nontestimonial, and in so holding the Ohio Supreme Court made the following observations:

> [T]he statement at issue here covers one made to a medical professional at a medical facility for the *primary* purpose of receiving proper medical treatment and not investigating past events related to criminal prosecution. It is true that the DOVE unit gathers forensic evidence for potential criminal prosecution, but its primary purpose is to render medical attention to its patients....
>
> \* \* \* \* \* \*
>
> While Stahl correctly argues that the DOVE unit, like other emergency rooms, partly serves a prosecutorial function by collecting evidence, this function is at best secondary to the DOVE unit's primary motivation, the care of its patients.

Stahl asserts that Markowitz's taking of evidence, which included swabbing for DNA with the help of ultraviolet light, taking pictures of Mazurek's mouth, and taking a napkin that Mazurek used after the incident, demonstrates the DOVE unit's prosecutorial purpose and renders Mazurek's statements testimonial. Emergency rooms routinely perform these procedures, and a witness in this situation could reasonably believe that the DOVE unit's medical examination, including the incident history statement, serves primarily a medical function.

\* \* \* \* \* \*

As noted, Mazurek gave a statement to Officer Ellis at the police station prior to her appearance at the DOVE unit examination. That statement, given to police, served an inherently prosecutorial function, and it is reasonable to conclude that Mazurek made her statement to Ellis knowing that the police would use it in prosecution of the crime. Having already identified the perpetrator to police, Mazurek could reasonably have assumed that repeating the same information to a nurse or other medical professional served a separate and distinct medical purpose such as those in this case: determining whether the assailant had any communicable diseases and whether any specified course of treatment might therefore be appropriate, and for purposes of structuring a release

plan to determine the likelihood of repeated activity in a residential or community setting. . . .

\* \* \* \* \* \*

Moreover, the consent form in this case does not refer to statements made by a patient. Rather, it references "evidence, information (including protected health information), clothing, colposcope photos, and photography documentation of injuries." This wording would naturally create a reasonable belief that the DOVE unit will release physical evidence to the police and any information resulting from the physical examination. But to a reasonable person, questioning by a nurse or other medical professional during an emergency-room examination would appear to serve a primarily health-care-related function. . . .

*Id.* at 841–46.

Many courts have reached similar conclusions on comparable facts. *See, e.g.,* *State v. Slater,* 285 Conn. 162, 939 A.2d 1105, 1118 (2008) ("The defendant contends that the administration of a rape kit for the collection of evidence necessarily would have made it apparent to the victim that her statements could be used later at trial. Under the facts of this case, we cannot agree. Section 19a–112a does require that medical personnel administer a rape kit to collect and preserve *physical* evidence related to the assault. That fact, however, does not eviscerate the medical treatment purpose of the exam for the victim."); *State v. Krasky,* 736 N.W.2d 636, 641–43 (Minn.2007) ("We conclude that the primary purpose of T.K.'s statements to Carney was to assess and protect T.K.'s health and welfare. Carney conducted a physical examination of T.K., questioned the foster mother about T.K.'s medical history, tested T.K. for sexually transmitted diseases, recommended that T.K. receive psychotherapy, and repeatedly told T.K.

that an examination was necessary in order to ensure that T.K. was healthy. . . . Although future acts of abuse were unlikely given that Krasky's parental rights had been terminated and he was incarcerated at the time T.K. reported the abuse, Carney's recommendation that T.K. receive psychotherapy indicates that her mental health was still at risk."); *see also Clark,* 199 P.3d at 1213 ("When we take into consideration all of the pertinent circumstances here—the underlying events of the evening in question, plus the subsequent actions and statements of Amouak, the nurse, and the doctor—we conclude that these circumstances objectively establish that Amouak and the emergency room personnel shared the primary purpose of obtaining/providing proper medical care for Amouak."); *Cage,* 56 Cal.Rptr.3d 789, 155 P.3d at 218 ("We conclude that the victim's statements to the deputy, both in a hospital emergency room, and later on tape at the sheriff's station, were testimonial. . . . We reach a contrary conclusion concerning the victim's statement to the physician who treated him at the hospital. . . . [T]he physician asked the victim a single question—'what happened?' The victim responded that his grandmother held him down while defendant, his mother, cut him. The primary purpose of the physician's general question, objectively considered, was not to obtain proof of a past criminal act, or the identity of the perpetrator, for possible use in court, but to deal with a contemporaneous medical situation that required immediate information about what had caused the victim's wound."); *State v. Schaer,* 757 N.W.2d 630, 637 (Iowa 2008) ("Although hospital personnel informed the police of Bergan's assault, there is no indication in the record of any relationship between the emergency room personnel and law enforcement authorities that would support a finding

[that] the medical providers' questioning of Bergan as to the cause of her injuries was 'a substitute for police interrogation at the station house.'"); *State v. Sandoval*, 137 Wash.App. 532, 154 P.3d 271, 273 (2007) ("Ms. Thacker told Dr. Jenkins that Mr. Sandoval kicked her, hit her with his fists, and hit her several times with a belt.... Dr. Jenkins used this information to conduct an examination of Ms. Thacker's injuries. The police were not present during Dr. Jenkins['] discussions with Ms. Thacker and Dr. Jenkins did not discuss whether the report would be used in a criminal investigation. According to Dr. Jenkins, the manner in which an injury occurs, including whether it was inflicted by a stranger or by a family member, impacts diagnosis and treatment.... In sum, Ms. Thacker's statements were made for diagnosis and treatment purposes and were not testimonial, or primarily given for criminal prosecution purposes."); *cf. State v. Mendez*, 148 N.M. 761, 242 P.3d 328, 340–41 (2010) ("[Sexual Assault Nurse Examiners] may be more adept at collecting and preserving evidence, but any medical provider who treats sexual abuse victims is engaged to some extent in the collection of evidence, and most understand that the evidence they collect—physical or otherwise—could be used in a subsequent prosecution.... T.F.'s statements in this case should not have been *categorically* excluded based on Nurse Lopez's status as a SANE nurse."). *But see Hernandez v. State*, 946 So.2d 1270, 1280 (Fla.Dist.Ct. App.2007) (finding statements by sexual assault victim to nurse testimonial); *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 244–45 (Ky.2009) (same); *Medina v. State*, 122 Nev. 346, 143 P.3d 471, 476 (2006) (same).

■ In line with the foregoing, we conclude that N.D.'s statements to Nurse Calow describing her physical attack and identifying her assailant were nontestimonial. N.D. was allegedly the victim of an unprotected sexual assault. The assault resulted in physical injuries to N.D.'s neck, ears, and back. N.D. was transported to the hospital shortly thereafter to receive medical attention and psychological assessment. She was tested for pregnancy and STDs and was given medication to reduce the risk of gonorrhea, chlamydia, and other infections. N.D. had already recounted the events in question to law enforcement before going to the hospital. And significantly, Nurse Calow described her protocol in pertinent part: "When we meet with them we're assessing the patient at first, her demeanor, any—I need to know her state of mind. Any medical history ... if she knows the assailant's medical history too it's important. That guides me, the *treatment plan* that I'm going to do." (Emphasis added). We believe that the totality of the circumstances, viewed objectively, indicates that the primary purpose of Nurse Calow's examination and the primary purpose of N.D.'s statements in the course thereof were to furnish and receive emergency medical and psychological care. We recognize that the examination had an investigative component. Nurse Calow was a forensic nurse. She took pictures of N.D.'s injuries and collected DNA samples to send to analysts. N.D. signed consent forms permitting any evidence obtained during the exam, as well as the medical record itself, to be forwarded to law enforcement. We further acknowledge that N.D. was transported to the hospital by police, though we note that no officers were present during Nurse Calow's intake interview or examination. At any rate, evaluating the encounter objectively and in light of all relevant factors, we still cannot say that the "primary purpose" of the exam from either the patient's or caretaker's perspective was to prove past facts with an eye toward trial. To echo the

Ohio Supreme Court, that function was at best secondary to the principal objective of providing and receiving medical attention. We therefore conclude that N.D.'s statements were nontestimonial under *Crawford, Davis,* and *Bryant* and did not implicate Perry's Sixth Amendment right to confrontation.

### 2. Record Prepared by Nurse Calow

The remaining question concerns the admissibility under *Crawford* of the medical record itself.

*Crawford* made clear that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." 541 U.S. at 59 n. 9, 124 S.Ct. 1354.

■ Nurse Calow was the technical "declarant" of the overall medical record. She appeared at trial and was subject to cross-examination by the defense. So assuming that the medical record itself was a testimonial document under *Crawford,* the Sixth Amendment posed no bar to the admission of the record on its face.

For the reasons stated, we conclude that the admission of N.D.'s medical record and statements relayed therein did not run afoul of Perry's Sixth Amendment rights.

### II. Admission of Prior Misconduct Evidence

Perry moved in limine to exclude any evidence of his prior bad acts including arrests, charges, and/or convictions. The trial court granted Perry's motion.

At trial, Perry testified that he had a relationship with N.D. for approximately six years. He further testified that on the night in question, N.D. tried to run him over with her car, and out of fear he struck the car with a tire iron.

The State argued to the trial court that, by claiming he was scared of the victim, Perry opened the door to evidence of his prior arrests for domestic violence involving N.D. The defense objected, but the trial court agreed that the door had been opened. The court found specifically that:

> the defendant has testified that they had basically a sexual relationship that lasted for over six years until this particular day in which she attacked him with a car and drove around and around and around him until he was forced to grab a tire tool out of the back of his truck as she was driving at him and fend off the car with the tire tool. I'm sorry I think that that opens the door to this reputation for peacefulness in the relationship and so, to the extent that there's a limited inquiry into past conduct between the parties, involving the parties, I'm going to allow a limited one.

Tr. p. 384.

The State then solicited on cross-examination that Perry had been arrested and charged for domestic disturbances involving N.D. on five prior occasions:

Q On August 2, 2005, police were dispatched to N.D.'s house on a complaint of an assault and you were arrested as a result of that, weren't you?

A Yes.

Q A criminal case was filed under 05137769, correct?

A Yes, I think so.

Q And that was dismissed because the victim didn't appear in court.

A Yes.

Q On January 22, 2006, police were dispatched on a complaint of a domestic disturbance where N.D. alleged she'd been hurt or threatened, correct?

A Guess so.

Q By you, correct?

A Uh, yes.

Q And criminal charges were filed in that under 06011114, correct?

A Yes.

Q And that was dismissed because N.D. didn't show up in court, correct?

A Yes.

Q On May 27, 2007, the police were dispatched because . . . for a harassment claim—I'm sorry, a disturbance claim, because N.D. said she'd been hurt or threatened?

A Yes.

Q By you, correct?

A Yes. Yes.

Q Charges were filed under 07095061, correct?

A Yes.

Q And those charges were dismissed because she didn't show up in court, correct?

A Yes.

Q On August 13, 2009, police responded to a domestic disturbance where N.D. said that you had hurt or threatened her, correct?

A Yes.

Q Charges were filed under 09083440, correct?

A Yes.

Q On January 10, 2010, the police were dispatched for a domestic disturbance because N.D. said that you had threatened or harmed her?

A Yes.

Q Charges were filed under 10001722, correct?

A Yes.

Q Do you know why those charges were dismissed?

A She didn't show.

Q April 7, 2010, police responded to a domestic disturbance where N.D. said that you had threatened or harmed her. Do you remember that?

A Just a little bit.

*Id.* at 401–04.

Perry argues that the trial court erred by admitting evidence of his five prior arrests and charges.

Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." Evidence Rule 404(b) is designed to prevent the jury from assessing a defendant's present guilt on the basis of his propensities—the so-called "forbidden inference." *Hicks v. State,* 690 N.E.2d 215, 218–19 (Ind.1997). Prior misconduct may be admissible to prove motive, intent, or other material facts at issue in a case. *Id.* Rule 404(b)'s list of permissible purposes is illustrative but not exhaustive. *Id.*

■ In assessing the admissibility of 404(b) evidence, a trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Wilson v. State,* 765 N.E.2d 1265, 1270 (Ind.2002). Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."

"[P]roof of the defendant's motive to commit the charged crime lends itself to

three legitimate theories of logical relevance." 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:35 (1999). "Evidence of motive may be offered to prove that the act was committed, or to prove the identity of the actor, or to prove the requisite mental state." 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5240 (1978).

"Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." *Iqbal v. State*, 805 N.E.2d 401 (Ind.Ct.App. 2004) (citing *Hicks*, 690 N.E.2d at 222; *Haggenjos v. State*, 441 N.E.2d 430, 431 (Ind.1982)). "When [ ] uncharged acts of domestic violence are directed against the same spouse or partner alleged in the pending charge, there is little or no need to invoke character reasoning in order to justify the admission of the evidence.... [T]he trial judge can readily admit the evidence on a noncharacter motive theory; the uncharged acts evidence hostility toward the victim, and in turn that hostility may be the motive for the charged act of domestic violence." 1 Imwinkelried, *supra*, § 4:19 (2008).

 Moreover, where a defendant claims self-defense, the State may use evidence of his prior misconduct to disprove that the victim was the first aggressor. *Embry v. State*, 923 N.E.2d 1, 9 (Ind.Ct. App.2010) (citing *Evans v. State*, 727 N.E.2d 1072, 1080 (Ind.2000)), *trans. denied; see also Goldsberry v. State*, 821 N.E.2d 447, 456 (Ind.Ct.App.2005) (evidence of defendant's prior assaults against victim was "admissible to demonstrate his motive was to batter her and not simply to defend himself").

 But before a defendant's alleged prior misconduct evidence can be admitted for a permissible purpose under Rule 404(b), there must be sufficient proof from which a jury could find that the defendant committed the prior acts in question. *Camm v. State*, 908 N.E.2d 215, 223–24 (Ind.2009), *reh'g denied*. Otherwise stated, "similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). This assessment is governed by Evidence Rule 104(b), which provides, "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." *Camm*, 908 N.E.2d at 223–24.

 "Evidence of a prior arrest or the lodging of charges should not itself be admitted under Rule 404(b), since neither has been traditionally viewed as sufficiently probative of the basic question of whether the underlying act occurred." *United States v. Robinson*, 978 F.2d 1554, 1559–60 (10th Cir.1992) (quoting 2 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 140 (1985)); *see also* 1 Imwinkelried, *supra*, § 2:10 (2003) ("The general view seems to be that standing alone, neither an arrest nor an indictment nor an accusation for an uncharged crime is enough to establish the defendant's identity as the perpetrator of the uncharged crime."); *United States v. McCarthur*, 6 F.3d 1270, 1279 (7th Cir.1993) ("The arrest, standing alone, does not establish conduct on McCarthur's part that sheds any light on her intent or the absence of mistake with respect to the offense charged in this case.... [T]he relevance, if any, of McCarthur's prior arrest for possession lay in the circumstances culminating in the arrest, not the arrest *per se*.

Again, the government had nothing to offer in this regard. . . .”); *Howell v. State*, 274 Ind. 490, 413 N.E.2d 225, 226 (1980) (“Here, there was only evidence of vague accusations. Defendant never admitted committing these other acts nor did the state introduce additional evidence proving that he had indeed committed them. . . . The evidence was irrelevant and, therefore, inadmissible.”).

■ We pause to clarify that prior misconduct evidence is not rendered inadmissible just because associated charges remain unadjudicated or resulted in dismissal. Authorities hold quite the contrary. Provided that “other foundational testimony [is] satisfactory,” courts admit prior misconduct evidence where associated charges have been dismissed—and even where the defendant has been tried for the prior misconduct and ultimately acquitted. 1 Imwinkelried, *supra*, § 2:10; 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5249 nn. 75, 76 (1978 & Supp.2011); *cf. Underwood v. State*, 722 N.E.2d 828, 833 (Ind. 2000), *reh'g denied.*

The relevant point here is that, where evidence of prior misconduct consists only of an arrest or charge, the fact of the arrest or charge alone will not suffice to sustain admission under Rules 404(b) and 104(b).

■ In line with the foregoing, we conclude that the trial court erred in admitting evidence of Perry's prior arrests and charges for domestic disturbances involving N.D. The State's evidence consisted only of the arrests and charges and no additional proof that Perry committed the prior acts at issue. We therefore find the foundational evidence insufficient to warrant admission. Moreover, we disagree with the trial court that Perry somehow “opened the door” to the evidence through his testimony on direct or cross-examination. The trial court found that Perry had adduced evidence of his own “reputation for peacefulness in the relationship,” which justified a limited inquiry into Perry's prior arrests and charges. We can identify no evidence or testimony of “reputation” admitted here which would permit such an inquiry. Perry claimed to be romantically involved with N.D. for six years, and he claimed to hit N.D.'s rental car out of fear that she was attempting to run him over. We do not construe any of this as reputation evidence justifying an inquiry into specific acts of misconduct or otherwise making the prior acts evidence curatively admissible.

■ Nor can we say that the trial court's error was harmless in this instance. The State's case with respect to the alleged assault rested in substantial part on the hearsay statements of a single victim. Perry denied N.D.'s allegations and offered a different account of the events in question. Perry also disputed that he knowingly possessed the cocaine found in the back of his truck. The erroneously admitted evidence consisted of five prior arrests and charges of domestic violence, all of which posed a danger of misleading the jury. The prior arrests and charges may have undermined Perry's credibility and suggested a propensity to commit the crimes alleged. Accordingly, we believe that the misconduct evidence likely had a prejudicial impact as to all offenses charged, and a reasonable possibility exists that it contributed to the verdicts rendered. On this basis we reverse Perry's convictions.

### III. Retrial

■ Whether Perry may be subjected to a new trial depends upon an analysis of the sufficiency of the evidence. *Lainhart v. State*, 916 N.E.2d 924, 939 (Ind.Ct.App. 2009). If, viewed as a whole, the State's evidence would have been sufficient to sustain the judgment, retrial would not offend

double jeopardy principles. *Id.* If, however, the evidence is insufficient, Perry may not be retried. *Id.*

### A. Strangulation

Indiana Code section 35–42–2–9(b) provides that a person who, in a rude, angry, or insolent manner, knowingly or intentionally (1) applies pressure to the throat or neck of another person or (2) obstructs the nose or mouth of another person, in a manner that impedes the normal breathing or the blood circulation of the other person, commits strangulation, a Class D felony.

■■■■ Having determined that N.D.'s statements to Nurse Calow were admissible, we find sufficient evidence to sustain Perry's strangulation conviction such that retrial would not violate double jeopardy. N.D. presented at the hospital with several abrasions to her neck including a ligature mark from a necklace. N.D. said that she had been strangled and that the assailant "grabbed her around the neck." N.D. further identified Perry as the perpetrator. In addition, DNA samples swabbed from N.D.'s neck matched Perry's DNA profile. A trier of fact could reasonably infer from this evidence that Perry knowingly or intentionally applied pressure to N.D.'s throat or neck in a manner that impeded her normal breathing or blood circulation.

### B. Criminal Mischief

Indiana Code section 35–43–1–2(a)(1) provides that a person who, recklessly, knowingly, or intentionally damages or defaces property of another person without the other person's consent commits criminal mischief. The offense is Class D felony if the resulting pecuniary loss is at least $2500. Ind.Code § 35–43–1–2(a)(1)(B)(i).

■■■■ Perry admitted to striking N.D.'s rental car with a tire iron. The vehicle was left severely dented and the windshield was entirely shattered. We thus find sufficient evidence to sustain Perry's criminal mischief conviction such that retrial would not violate double jeopardy.

### C. Possession of Cocaine

Indiana Code section 35–48–4–6(a) provides that a person who knowingly or intentionally possesses cocaine commits a Class D felony. The offense is a Class C felony if the amount of the drug is three grams or more. Ind.Code § 35–48–4–6(b)(1)(A).

■■■■ A conviction for possession of contraband may rest upon proof of either actual or constructive possession. *Washington v. State*, 902 N.E.2d 280, 288 (Ind. Ct.App.2009). Actual possession occurs when a person has direct physical control over the substance, *Walker v. State*, 631 N.E.2d 1, 2 (Ind.Ct.App.1994), while constructive possession occurs when someone has both (1) the intent and (2) the capability to maintain dominion and control over the subject contraband, *Atwood v. State*, 905 N.E.2d 479, 484 (Ind.Ct.App.2009). To prove the intent element of constructive possession, the State must demonstrate the defendant's knowledge of the presence of the controlled substance. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind.1999). Knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband. *Id.* The capability requirement is met when the State shows that the defendant is able to reduce the controlled substance to the defendant's personal possession. *Id.*

■■■■ Here we find sufficient evidence to sustain Perry's conviction for Class C felony possession of cocaine. A trier of fact could reasonably have concluded that Perry constructively possessed the subject contraband. Perry was discovered driving

**62**

a truck with no one else inside. A plastic bag in the bed of truck contained a pair of jeans, which in turn contained cocaine totaling ten grams. First, the evidence raises an inference of Perry's intent to maintain control over the subject contraband, as Perry had exclusive dominion and control over the vehicle containing the cocaine when he was found driving. Second, Perry was capable of maintaining dominion and control over the cocaine, as it was in the bed of the truck and could readily be reduced to his personal possession. For these reasons we find sufficient evidence to support Perry's conviction for possession such that retrial would not offend double jeopardy.

Reversed and remanded.

KIRSCH, J., and MATHIAS, J., concur.