Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.



**FILED**

Jan 25 2013, 9:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ERIC KOSELKE**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

RICKY J. THURSTON,                      )
                                        )
    Appellant-Defendant,                )
                                        )
        vs.                             )       No. 49A02-1204-CR-289
                                        )
STATE OF INDIANA,                       )
                                        )
    Appellee-Plaintiff.                 )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt M. Eisgruber, Judge
Cause No. 49G01-1003-FA-14461

**January 25, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Ricky J. Thurston appeals his conviction for Rape[1] as a class A felony and his adjudication as a Habitual Offender.[2] Thurston presents the following restated issues for review:

1. Did the trial court abuse its discretion in admitting records of the victim's sexual assault examination?

2. Did the trial court abuse its discretion in admitting a photograph taken during the victim's sexual assault examination?

3. Did the trial court abuse its discretion during the habitual offender phase by taking judicial notice of a Chronological Case Summary (CCS) from one of Thurston's predicate convictions?

We affirm.

On the evening of October 19, 2006, T.K. became involved in a heated argument with her husband and her daughter. When T.K. realized she was out of cigarettes, she asked her husband for the car keys so that she could drive to a nearby service station and buy more. T.K.'s husband refused to give her the keys because T.K. had been drinking, and T.K. left the house and began walking to the service station. T.K.'s husband followed her out of the house and for some distance, trying to convince her to return. T.K. continued walking, and her husband returned to the house. T.K. walked approximately four blocks to the service station and purchased cigarettes.

As T.K. was walking back home, she saw a silver car drive past her, stop, turn around, and then drive back to her. The driver and sole occupant of the vehicle asked her if she

---

[1] Ind. Code Ann. § 35-42-4-1 (West, Westlaw current through 2012 2nd Reg. Sess.).
[2] Ind. Code Ann. § 35-50-2-8 (West, Westlaw current through 2012 2nd Reg. Sess.).

wanted a ride. T.K. responded affirmatively and got into the car. The man said his name was Troy, that he was twenty-six years old, and that he worked in construction. T.K. and the man drove around and talked for a while, smoking and drinking from a half-pint bottle of whiskey T.K. had taken from her home. When they ran out of whiskey, the man drove to a nearby house, which he told T.K. belonged to his employer, to get some beer. T.K. waited in the car while the man entered the house and emerged with a six-pack of beer. He then drove T.K. to a park and stopped the vehicle, where they continued to smoke, drink, and talk.

At some point, T.K. became tired and wanted to go home. When T.K. turned to ask the man to take her home, she saw that he had pulled his penis out of his pants and was masturbating. T.K. immediately demanded to be taken home, and the man stated that he wanted to have sex. T.K. said no and again asked to be taken home. The man then reached across T.K. and pulled a semiautomatic handgun out of the glove compartment. The man pressed the muzzle of the gun to the side of T.K.'s head and forced her to remove her clothes. T.K., who was experiencing symptoms of premature menopause including heavy menstrual bleeding, told the man that she was having menstrual problems in hopes that it would discourage him from continuing. In response, the man ordered T.K. to remove her tampon and throw it out of the vehicle. T.K. complied, and then climbed on top of the man and submitted to vaginal intercourse while he continued to hold the gun to her head.

When he finished, the man put the gun back into the glove compartment and got out of the vehicle to urinate. When the man walked out of T.K.'s line of sight, she ran from the vehicle and climbed a fence into the backyard of a nearby house, where she hid behind a

3

picnic table. T.K. watched as the man returned to the vehicle and called her name, and then drove away. T.K. then went to the house and knocked on the door. When the homeowner answered the door, T.K. asked her to call 911 because she had been raped. Police responded and an ambulance took T.K. to the hospital.

T.K. was eventually brought to the Center for Hope, a unit of Community Hospital that treats victims of sexual assault. Linda Young, a registered nurse who had been trained in the Center's procedures, conducted an interview and examination of T.K. and recorded her findings and observations on the appropriate forms. T.K. was subsequently interviewed by Indianapolis Police Department Detective Richard Burkhardt. T.K. returned to the scene of the rape with Detective Burkhardt, where crime scene investigators recovered beer cans, cigarette butts, and a soiled tampon. T.K. also tried to show Detective Burkhardt the other places the man had taken her prior to the rape, but she was unable to identify the house where the man had stopped to get beer.

Forensic analysis of the samples taken from T.K.'s body and clothing did not disclose the presence of seminal material, and the case went dormant for approximately four years. Eventually, however, DNA analysis was performed on the cigarette butts recovered from the scene, and they were determined to contain T.K.'s and Thurston's DNA. Subsequent investigation revealed that Thurston owned a semiautomatic handgun around the time of the rape, that he had used the name "Troy" to identify himself, and that his former employer lived near the area where T.K. said that her rapist obtained beer the night of the rape.

4

Thurston's former employer told investigators that Thurston had lived nearby and would stop by to obtain money or beer, and that he drove a grey Ford Thunderbird at that time.

On March 2, 2011, the State charged Thurston with class A felony rape and class B felony criminal confinement. The State also alleged that Thurston was a habitual offender. A two-day jury trial commenced on February 13, 2012, and Thurston was found guilty as charged.[3] Thurston waived his right to a trial by jury on the habitual offender allegation and was found to be a habitual offender by the trial court. Thurston now appeals.

1.

Thurston first argues that the trial court abused its discretion in admitting the record of T.K.'s sexual assault examination prepared by Nurse Young. The decision to admit or exclude evidence lies within the trial court's sound discretion. *Filice v. State*, 886 N.E.2d 24 (Ind. Ct. App. 2008), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Dixon v. State*, 967 N.E.2d 1090 (Ind. Ct. App. 2012). We will not reverse absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Johnson v. State*, 831 N.E.2d 163 (Ind. Ct. App. 2005), *trans. denied*. "Even when a decision on the admissibility of evidence is an abuse of discretion, we will not reverse a judgment where that error is harmless, that is, where the error did not affect the substantial rights of a party." *Dixon v. State*, 967 N.E.2d at 1092.

---

[3] During the sentencing hearing, the trial court merged the criminal confinement conviction into the rape conviction.

Thurston argues that the admission of the medical record prepared by Nurse Young violated his Sixth Amendment right to confront and cross-examine witnesses against him because Nurse Young did not testify at trial. The medical record contained Nurse Young's record of T.K.'s description of the attack, as well as Nurse Young's observations of T.K.'s physical condition and mood, including descriptions of scratches and bruises on T.K.'s body. By the time of Thurston's trial, Nurse Young no longer worked at the Center for Hope and could not be located. The State introduced the record through the testimony of Nurse Pamela Jahnke, the coordinator for the Center of Hope and Nurse Young's supervisor at the time of T.K.'s sexual assault examination.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" In *Crawford v. Washington*, the United States Supreme Court held that, even where a statement is deemed admissible under the rules of evidence, if the statement is testimonial in nature, then the Sixth Amendment bars its admission unless the declarant is unavailable to testify and the adverse party has had an opportunity for cross-examination. 541 U.S. 36 (2004). Although the Court declined to set forth a comprehensive definition of "testimonial" statements in *Crawford*, it identified "various formulations" of the "core class of 'testimonial' statements," including ex parte in-court testimony or its functional equivalent, formalized extrajudicial statements such as affidavits and depositions, and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id.* at 52. In *Davis v.*

6

*Washington*, the Court clarified the distinction between testimonial and nontestimonial statements as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006). In order to determine whether the primary purpose of an interrogation is to address an ongoing emergency so as to render the resulting statements nontestimonial, we must objectively evaluate the circumstances in which the encounter occurs—e.g., at or near the scene of the crime versus a police station, during an ongoing emergency or afterwards—and the statements and actions of the parties. *Michigan v. Bryant*, 131 S.Ct. 1143 (2011).

This court addressed the issue of testimonial statements in the context of sexual assault examinations in *Perry v. State*, 956 N.E.2d 41 (Ind. Ct. App. 2011). In *Perry v. State*, we noted that the U.S. Supreme Court had not resolved whether and to what extent its holdings in *Davis v. Washington* and *Michigan v. Bryant* applied beyond the context of police interrogation, but lower courts had employed the primary purpose inquiry beyond the realm of explicit police questioning. *Perry v. State*, 956 N.E.2d 41. Thus, in determining whether statements made by the victim during a sexual assault examination were testimonial, the court asked "what, objectively speaking, was the primary purpose of [the nurse's] examination and [the victim's] statements incident thereto?" *Id.* at 53.

7

After surveying case law from a number of other jurisdictions, this court concluded that the totality of the circumstances objectively indicated that the primary purpose of the examination and the victim's statements was to furnish and receive emergency medical and psychological care. *Perry v. State*, 956 N.E.2d 41. The court noted that the victim had endured an unprotected sexual assault which resulted in physical injuries to her neck, ears, and back, and she was transported to the hospital shortly thereafter to receive medical treatment and psychological assessment. At the hospital, the victim was tested for pregnancy and sexually transmitted diseases and was given medication to reduce the risk of infections. The court acknowledged the victim was transported to the hospital by the police and the examination had an "investigative component" in that the nurse took photos and collected evidence for forensic testing. *Id.* at 56. Nevertheless, the court concluded that

> evaluating the encounter objectively and in light of all relevant factors, we still cannot say that the "primary purpose" of the exam from either the patient's or caretaker's perspective was to prove past facts with an eye toward trial. To echo the Ohio Supreme Court, that function was at best secondary to the principal objective of providing and receiving medical attention.

*Id.* Thus, the court concluded that the victim's statements to the sexual assault examination nurse were nontestimonial and their admission did not violate Perry's Sixth Amendment right to confront and cross-examine witnesses. *Perry v. State*, 956 N.E.2d 41. *See also Palilonis v. State*, 970 N.E.2d 713 (Ind. Ct. App. 2012) (holding that rape victim's statements to sexual assault nurse were nontestimonial because their primary purpose was to furnish and receive emergency medical and psychological care), *trans. denied*.

8

On appeal, Thurston attempts to distinguish *Perry v. State* by noting that in that case, the unavailable victim's statements were deemed nontestimonial, whereas here, the records prepared by the unavailable sexual assault nurse were deemed nontestimonial. Thurston seizes on language from *Perry v. State* addressing the admissibility of the victim's medical record from the sexual assault examination, of which the nurse was the declarant. The court concluded that even if the record was testimonial, the Sixth Amendment did not bar its admission because the nurse appeared at trial and was subject to cross-examination. *Perry v. State*, 956 N.E.2d 41 (citing *Crawford v. Washington*, 541 U.S at 59 n.9 (holding that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"). Thurston argues that we should simply assume that the record prepared by Nurse Young is testimonial because this court did so in *Perry v. State*. Thurston misunderstands the import of this court's statement in *Perry v. State*. The court did not hold that the medical record was testimonial; rather, it chose not to address the issue of whether the record was testimonial because even if it was, it was still admissible because the declarant testified at trial.

Moreover, although the facts of this case differ from those in *Perry v. State* in that here, it was the victim who testified and the sexual assault nurse who was absent from trial, we conclude that under the facts of this case, this is a distinction without a difference. As in *Perry v. State*, the primary purpose of Nurse Young's interview and examination of T.K. was to assess her physical and psychological condition and provide her with the appropriate care. Indeed, Nurse Jahnke testified that patients who arrive at the Center for Hope are given

9

"prophylactic testing and medication to prevent STDs, for emergency contraception, if the patient desires that," and then given "referrals on for counseling services . . . and also for physical follow-up" and, upon request, provided with other information on "domestic violence, housing, that sort of thing." *Transcript* at 174. Nurse Jahnke testified further that during the interview and examination process, a nurse also assesses the victim's psychological state, "because women, or anyone. . . going through a traumatic event can be affected by that psychologically, mentally, emotionally . . . as a nurse, we do a holistic evaluation or assessment of our patients in order to provide care and diagnosis of that patient." *Id.* at 179. We acknowledge that the examination also served an investigative purpose, but we "cannot say that the 'primary purpose' of the exam from either the patient's *or caretaker's* perspective was to prove past facts with an eye toward trial." *Perry v. State*, 956 N.E.2d at 57 (emphasis supplied). Accordingly, we conclude that the record of T.K.'s sexual assault examination prepared by Nurse Young was nontestimonial and consequently did not implicate Thurston's Sixth Amendment right to confront and cross-examine witnesses.[4]

2.

Next, Thurston argues that the trial court abused its discretion by admitting into evidence a photograph taken during T.K.'s sexual assault examination, which depicted T.K.'s cervix with menstrual blood pooling beneath it, because the photograph was not properly

---

[4] To the extent Thurston argues that the admission of T.K.'s statements to Nurse Young violated his confrontation rights, this argument also fails because T.K. testified and was subject to cross-examination. *See Crawford v. Washington*, 541 U.S 36.

authenticated. Specifically, he argues that Nurse Jahnke could not testify that the photograph was a true and accurate depiction of the condition of T.K.'s body on the date of the exam because Nurse Jahnke did not conduct the exam or take the picture.

Assuming without deciding that the photograph was improperly admitted, reversal is not warranted because the error was harmless. Thurston claims that he was harmed by the admission of the photograph because it established that T.K. was menstruating at the time of the rape, which was in turn used to explain why no seminal material was discovered during the sexual assault examination. There was, however, ample evidence aside from the photograph establishing that T.K. was menstruating. T.K. testified that she was experiencing symptoms of premature menopause, including heavy menstrual bleeding at the time of the rape. She testified further that she was wearing a tampon on the night of the rape, and that Thurston ordered her to remove it and throw it out of the car. Police later recovered a soiled tampon from the scene of the rape, and forensic testing revealed the presence of blood on the crotch area of the underwear and sweatpants T.K. was wearing on the night of the rape. Thus, the photograph was merely cumulative of other, properly admitted evidence, and therefore harmless. *See Bryant v. State*, 802 N.E.2d 486 (Ind. Ct. App. 2004) (noting that erroneously admitted evidence that is merely cumulative of other evidence in the record is harmless and not grounds for reversal), *trans. denied*.

3.

Finally, Thurston argues that the trial court abused its discretion during the habitual offender phase of the trial by taking judicial notice of a CCS from one of Thurston's previous

11

convictions. We need not address this argument because even assuming that the trial court improperly took judicial notice of the CCS, reversal is not warranted because the alleged error was harmless.

Pursuant to I.C. § 35-50-2-8(a), a person is a habitual offender if the finder of fact determines the State has proven beyond a reasonable doubt that the defendant has accumulated two prior unrelated felony convictions. A person has accumulated two prior unrelated felony convictions only if the second prior unrelated felony was committed after sentencing for the first prior unrelated felony, and the offense for which the State seeks to have the person sentenced as a habitual offender was committed after sentencing for the second prior unrelated felony. I.C § 35-50-2-8(c).

In order to prove Thurston's habitual offender status, the State introduced documentary and fingerprint evidence to establish that Thurston had previous convictions for class C felony carrying a handgun without a license and class C felony escape. To establish the required sequence, the State introduced as State's Exhibit 1 a charging information and probable cause affidavit indicating that Thurston committed the handgun offense on June 29, 1998, as well as an abstract of judgment indicating that Thurston was sentenced for that offense on October 14, 1998. The abstract of judgment also indicated that Thurston's sentence was modified on January 13, 1999, and it was signed and file-stamped on that date. With respect to the second predicate offense, the State presented as State's Exhibit 2 a charging information and abstract of judgment indicating that Thurston committed escape on November 25, 1998 and was sentenced for that offense on May 12, 1999.

12

During the habitual offender phase of Thurston's trial, defense counsel pointed out that the abstract of judgment in State's Exhibit 1 was signed on January 13, 2009, more than a month after the commission date for his second predicate felony, and argued that the abstract was insufficient to establish the required sequence. The State responded by providing the court with a printout of the CCS from the handgun offense and asking the court to take judicial notice of the record. Thurston objected, arguing that the court could not take judicial notice of another court's file and, in any event, that the printout was not part of a court file. The trial court concluded that it could take judicial notice of the CCS.

Assuming that the trial court improperly took judicial notice of the CCS, the error is harmless for two reasons. First, at least with respect to the evidence relevant to the habitual offender allegation, i.e., the date of Thurston's sentencing on the handgun offense, the CCS was merely cumulative of State's Exhibit 1. The abstract of judgment contained in State's Exhibit 1 clearly indicates that Thurston was sentenced on October 14, 1998, over a month before he committed the second predicate offense, and that Thurston's sentence was modified on January 13, 1999. Because the CCS was merely cumulative of these facts, any error was harmless.

Second, the trial court found Thurston to be a habitual offender without relying on the CCS. Specifically, the trial court stated:

> I will find that the State has met their burden and I am basin[g] it on that State's exhibit 1 which reflects a sentencing modification date but it also reflects on that same abstract that the date of sentencing was October 14th 1998, therefore I find that it was the requisite filing/conviction, filing/conviction in this case so I do believe the State has met their burden on the habitual enhancement.

13

*Transcript* at 476. Because the trial court specifically indicated that it relied on State's

Exhibit 1 in finding that the State had established the required sequence to support a habitual

offender finding, any error in taking judicial notice of the CCS was harmless.[5]

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.

---

[5] Contrary to Thurston's arguments on appeal, State's Exhibit 1 was sufficient to prove that Thurston was sentenced for the handgun offense prior to committing escape. Thurston argues because the abstract of judgment also indicates that Thurston's sentence was modified on January 13, 1999, and the abstract was signed and file-stamped on that date, it is somehow insufficient to establish that he was sentenced on October 14, 1998. Thuston's argument is meritless.