**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**LISA M. JOHNSON**
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| OO AKA, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1207-CR-560 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kimberly J. Brown, Judge
Cause No. 49G16-1108-FD-61186

**March 8, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

On August 27, 2011, Oo Aka hit his wife, C.C. (hereinafter "the victim"), in the hand and head with a children's bicycle. As a result of being hit with the bicycle, the victim sustained injuries on both her hand and her head. On August 30, 2011, the State charged Aka with Count I, Class D felony domestic battery; Count II, Class A misdemeanor domestic battery; Count III, Class D felony battery; and Count IV, Class A misdemeanor battery. Following a jury trial, Aka was found guilty of Counts I through IV. The trial court found that the Counts III and IV merged into Counts I and II. On appeal, Aka challenges his convictions by claiming that the trial court abused its discretion on numerous grounds including: (1) allowing the jury to begin deliberations at 11:15 p.m., (2) finding he and the victim's twelve-year-old daughter competent to testify at trial, (3) limiting the scope of a certain witness's testimony, and (4) allowing an emergency room nurse who treated the victim to testify about certain statements made by the victim during the nurse's evaluation of the victim. Finding no abuse of the trial court's discretion, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Aka and the victim are a Burmese couple who have been married for fifteen years and have seven children together. The victim was home with the children in their apartment on the evening of August 27, 2011. When Aka arrived home late that evening, he appeared to be drunk.

At some point, Aka and the victim began arguing. Their argument awoke their twelve-year-old daughter, M.N.F., who had been asleep in one of the bedrooms. Upon hearing her parents arguing, M.N.F. left the bedroom and went to the living room. As

2

M.N.F. entered the living room, she saw Aka pick up a small children's bicycle and strike the victim. The victim put her hand up to prevent the blow and the bicycle cut her hand. Aka then struck the victim with the bicycle a second time. The second blow struck the victim on the back of her head, leaving a six centimeter laceration.

Hurt and bleeding, the victim attempted to flee the apartment. As she fled, Aka chased after the victim and indicated that he wanted to kill her. The victim ran to the home of Naw Htoo, a neighbor who helps Burmese refugees. Naw Htoo eventually opened the door, let the victim into her apartment, and called the police.

When the police arrived, the responding officers found Aka "banging" on Naw Htoo's door. Tr. p. 224. Inside, the officers found the victim. The victim was bleeding, and she pointed at Aka, saying, "he did it." Tr. p. 225. Aka was subsequently arrested.

On August 30, 2011, the State charged Aka with Count I, Class D felony domestic battery;[1] Count II, Class A misdemeanor domestic battery;[2] Count III, Class D felony battery;[3] and Count IV, Class A misdemeanor battery.[4] The State subsequently amended the charging information to include Count V, Class D felony criminal recklessness.[5]

In January of 2012, Aka requested a competency hearing to determine whether M.N.F. was competent to testify at trial. The trial court conducted a competency hearing on January

---

[1] Ind. Code § 35-42-2-1.3 (2011).
[2] Ind. Code § 35-42-2-1.3.
[3] Ind. Code § 35-42-2-1 (2011).
[4] Ind. Code § 35-42-2-1.
[5] The charging information for Count V was not included in Appellant's Appendix. However, it appears that the charge of class D felony criminal recklessness was brought in accordance with Indiana Code section 35-42-2-2 (2011).

31, 2012, after which it determined that M.N.F. was competent to testify.

A jury trial was conducted on May 31, 2012. After a full day of trial, jury deliberations began at approximately 11:15 p.m. Aka moved for a mistrial due to the lateness of the hour, and this motion was denied by the trial court. The jury returned guilty verdicts on Counts I through IV and an acquittal on Count V. The trial court found that Counts III and IV merged into Counts I and II, and sentenced Aka to an aggregate term of 545 days of incarceration. This appeal follows.

## DISCUSSION AND DECISION

### I. Whether the Trial Court Abused its Discretion in Allowing the Jury to Begin Deliberations Late in the Evening

Aka contends that the trial court abused its discretion in allowing the jury to begin deliberating at 11:15 p.m., after having worked for nearly thirteen-and-a half to fourteen hours. The Indiana Supreme Court has previously held that "the trial judge is in the best position to determine whether or not to adjourn the trial." *Peck v. State*, 563 N.E.2d 554, 559 (Ind. 1990). The rationale behind this position was set forth by the Indiana Supreme Court in *King v. State*, in which the Court stated:

> The trial judge was also a participant in the trial and was in a better situation to assess fatigue and state of mind tha[n] this court. The decision to continue into the night was one of those undoubtedly made after considering all of the negative aspects whether raised by appellant or not. The judge had the unique ability to weigh the pros and cons of an adjournment and his determination will not be disturbed. That is not to say that all decisions of this type will be met with approval. Rather, it means that a clear showing of abuse of discretion coupled with prejudice to the defendant must be shown.

531 N.E.2d 1154, 1161 (Ind. 1988).

4

Generally, a showing of prejudice requires more that an allegation of a long jury work day and an unfavorable result. *See generally Farrell v. State*, 622 N.E.2d 488, 492-93 (Ind. 1993) (providing that where defendants have been unable to show more than late hours and an adverse verdict, courts have been reluctant to reverse a conviction); *Peck*, 563 N.E.2d at 559 (providing that the trial court did not abuse its discretion in handing the case over to the jury at approximately 9:30 p.m. and letting the jury deliberate for nearly four hours when the jury had a number of breaks during the day and did not appear exhausted); *Evans v. State*, 563 N.E.2d 1251, 1258 (Ind. 1990) (providing that the trial court did not abuse its discretion in subjecting the jury to allegedly "overbearing" trial hours when final argument on the penalty phase began at 10:00 p.m.), *reh'g granted on other gnds.*; *Morris v. State*, 266 Ind. 473, 484-85, 364 N.E.2d 132, 139 (1977) (providing trial court did not abuse its discretion in denying the jury's request for sleep and/or coffee at 3:30 a.m. when there were no motels or restaurants open and there was no showing in the record that the denial in any way influenced the jury in their decision); *Moore v. State*, 569 N.E.2d 695, 702 (Ind. Ct. App. 1991) (providing that the trial court did not abuse its discretion in having the jury work continuously for seventeen hours). In *Moore*, the appellant raised an argument similar to that raised by Aka in the instant matter. Specifically, the appellant argued that the trial court abused its discretion in having the jury work continuously for seventeen hours, with the jury returning a verdict at 2:05 a.m. 569 N.E.2d at 702. The appellant, however, did not make a showing of prejudice or juror fatigue, and this court concluded that his challenge appeared to be based on an unfavorable result, rather than on a bona-fide concern for the jury's ability to

5

function with mental acuity after a long day. *Id.*

In the instant matter, Aka argues that the trial court abused its discretion in allowing the jury to begin deliberations at 11:15 p.m., after an approximately thirteen-and-a-half to fourteen hours of work. Aka acknowledges that the jury was given "a lot of breaks" during the day, Tr. p. 279, but argues that fourteen hours is "too long to expect jurors to work and still be mentally sharp enough to fairly consider all the evidence and render a reliable and just verdict." Appellant's Br. p. 12. Aka, however, does not point to anything in the record that would demonstrate juror fatigue such that would impact the jury's ability to consider the evidence and render a reliable verdict. Again, Aka's claim relating to the long hours put in by the jury, without more, is insufficient to prove prejudice. *See generally Farrell*, 622 N.E.2d at 493; *Peck*, 563 N.E.2d at 559; *Evans*, 563 N.E.2d at 1258; *Morris*, 266 Ind. at 484-85, 364 N.E.2d at 139; *Moore*, 569 N.E.2d at 702.

In light of the lack of evidence tending to demonstrate juror fatigue or prejudice, we conclude that Aka's argument, like the appellant's argument in *Moore*, appears to be based on an unfavorable result, rather than on a bona-fide concern for the jury's ability to function with mental acuity after a long day. 569 N.E.2d at 702. The jurors were given many breaks during the day and nothing indicates that the long hours on the single day of trial rendered them unable to reach a just and reliable verdict. As such, we conclude that the trial court did not abuse its discretion in this regard.

## II. Whether the Trial Court Abused its Discretion in Finding Aka and the Victim's Twelve-Year-Old Daughter to be a Competent Witness

Aka next contends that the trial court abused its discretion in finding that he and the victim's twelve-year-old daughter, M.N.F., was competent to testify at trial. Specifically, Aka claims that the record does not demonstrate that M.N.F. understood the difference between telling a lie and telling the truth, knew that she was required to tell the truth, or actually understood what a true statement was. The State, for its part, argues that Aka has waived the instant challenge on appeal, and, alternatively, that the trial court acted within its discretion in determining that M.N.F. was competent to testify at trial.

In *Kochersperger v. State*, 725 N.E.2d 918, 922 (Ind. Ct. App. 2000), this court determined that the defendant had waived his challenge to the competency of the child witness on appeal because he had "offered no objection to the trial court's ruling at the conclusion of the competency hearing and likewise failed to offer any objection when [the child] was called as a witness at trial." In concluding that the defendant had waived his challenge to the competency of the child witness, this court noted that a "'[t]imely objection should be made to any improprieties that may occur during the course of a trial so that the trial judge may be informed and may take effective action to remedy the error or grievance complained of.'" *Id.* (quoting *Jackson v. State*, 485 N.E.2d 144, 145 (Ind. Ct. App. 1985), *trans. denied*). "A defendant's failure to object to a child's testimony acts as a waiver of any question of the competency of the child as a witness." *Id.* (citing *Jackson*, 485 N.E.2d at 145).

In the instant matter, like in *Kochersperger*, Aka did not object to the trial court's determination that M.N.F. was competent at the conclusion of the competency hearing or

when M.N.F. was called as a witness at trial. During both the competency hearing and M.N.F.'s trial testimony, counsel for the State and Aka asked M.N.F. questions relevant to a competency determination. Aka did not object during either proceeding upon hearing M.N.F.'s answers to counsels' questions. As such, in light of this court's conclusion in *Kochersperger*, we conclude that Aka has waived appellate consideration of his challenge to M.N.F.'s competency to testify. *See id.*

Waiver notwithstanding, we conclude that the trial court properly determined that M.N.F. was competent to testify. "According to the Indiana Rules of Evidence, '[e]very person is competent to be a witness except as otherwise provided in these rules or by act of the Indiana General Assembly." *Kien v. State*, 866 N.E.2d 377, 385 (Ind. Ct. App. 2007), *trans. denied*. With respect to child witnesses, "[w]e require trial courts to establish that child witnesses are competent to testify by demonstrating that they (1) understand the difference between telling a lie and telling the truth, (2) know they are under a compulsion to tell the truth, and (3) know what a true statement actually is." *Haycraft v. State*, 760 N.E.2d 203, 209 (Ind. Ct. App. 2001). "One proper technique for determining that a prospective child witness understands the meaning of truth is to ask the child to give an example of someone telling a lie." *Harrington v. State*, 755 N.E.2d 1176, 1181 (Ind. Ct. App. 2001).

"The determination as to a witness's competency lies within the sound discretion of the trial court and is reviewable only for a manifest abuse of that discretion." *D.G. v. State*, 947 N.E.2d 445, 448-49 (Ind. Ct. App. 2011). "It is within the sound discretion of the trial court to determine whether a child is competent to testify based on the trial court's

8

observation of the child's demeanor and responses to questions posed to him or her by counsel and the court." *Id*. at 449. "To be qualified to testify, a child need not be a model witness, have an infallible memory, or refrain from making inconsistent statements." *Kien*, 866 N.E.2d at 385.

In the instant matter, Aka claims that the trial court abused its discretion in finding M.N.F. to be competent to testify at trial because "[t]he record does not demonstrate that [M.N.F.] understood the difference between telling a lie and telling the truth, knew she was required to tell the truth, or actually understood what a true statement was." Appellant's Br. p. 14. However, despite Aka's claim to the contrary, upon review, we conclude that the record does in fact demonstrate that M.N.F. understood the difference between telling a lie and telling the truth, knew that she was under compulsion to tell the truth, and knew what a true statement actually was. During the competency hearing, M.N.F. engaged in the following exchange with the deputy prosecuting attorney:

> [The State]: I'm going to show you this. Can you tell the Judge what that's a picture of?
> [M.N.F.]: Dog.
> [The State]: Okay, and if I said that was a picture of a cat, would that be the truth?
> [M.N.F.]: She lie.
> [The State]: It would be a lie, is that what you said?
> [M.N.F.]: Yes.
> [The State]: Okay, do you know if telling the truth or telling a lie is a good thing?
> [M.N.F.]: Telling the truth is good; lying is not good.
> [The State]: Okay, and you know, do you know we're in a court room today?
> [M.N.F.]: Yes.
> [The State]: Do you think it's important to tell the truth when you're in a court room?
> [M.N.F.]: Yes, I think so.

9

[The State]:   And do you think you should lie when you're in the court room?
[M.N.F.]:   No.

Tr. p. 18.

Likewise, at trial, M.N.F. engaged in the following exchange with the deputy

prosecuting attorney:

[The State]:   Okay, and what's your favorite color, [M.N.F.]?
[M.N.F.]:   Purple.
[The State]:   Okay, and if I told you today that I was wearing purple, would that be the truth or would that be a lie?
[M.N.F.]:   A lie.
[The State]:   Okay, alright.  And you know you need to tell the truth in the courtroom today?
[M.N.F.]:   Mm.
[The State]:   Can you answer yes or no for me?  Can you answer yes or no? do you know you need to tell the truth today?
[M.N.F.]:   Yes.

Tr. p. 118.  M.N.F. also engaged in the following exchange with Aka's counsel:

[The Defense]:      Before we left I had asked you if you knew what it meant to tell a lie.
[M.N.F.]:      Yes, I know.
[The Defense]:      Can you tell me what it means to tell a lie?  Do you know what a lie is?
[M.N.F.]:      I know what a lie is.
[The Defense]:      What is it?  And you can describe it however you want. [M.N.F.], have your brothers or sisters -- you've got six or seven brothers and sisters?
[M.N.F.]:      Yes.
[The Defense]:      And some of them are younger than you?
[M.N.F.]:      Yes, yes.
[The Defense]:      Has a younger brother or sister ever told a lie that you know of?
[M.N.F.]:      One of them did.
[The Defense]:      Okay, can you tell me about that?  What they lied about?
[M.N.F.]:      My brother was supposed to take a bread to my aunt, and he ate it all.  He didn't take it, but then he said [he] didn't eat it.

10

Tr. pp. 128-29.

Upon review, we conclude that these exchanges with counsel demonstrate that M.N.F. understood the difference between telling a lie and telling the truth, knew that she was under compulsion to tell the truth, and knew what a true statement actually was. In arguing that the trial court abused its discretion in finding that M.N.F. was competent to testify, Aka claims the record demonstrates that M.N.F. was not competent to testify because M.N.F. could not articulate what a promise was and the fact that she testified that, while she remembered talking to defense counsel before trial, she did not remember giving a taped statement about the night her mother was injured. Aka's claim, however, merely amounts to an invitation for this court to reweigh M.N.F.'s testimony and reassess her credibility, which we will not do. *See Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002) (providing that upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses). In light of the testimony demonstrating that M.N.F. knew both what a true statement was as well as the difference between the truth and a lie, and also knew that she needed to tell the truth, we conclude that the trial court did not abuse its discretion in finding M.N.F. competent to testify at trial.

### III. Whether the Trial Court Abused its Discretion in Prohibiting a Witness from Providing Impeachment Testimony Relating to a Specific Collateral Matter

Aka also contends that the trial court abused its discretion and violated his rights to present a defense and to a fair try by excluding certain evidence of the victim's bias against him.

[T]he decision to admit or exclude evidence is within the trial court's sound

11

discretion and is afforded great deference on appeal. *Bacher v. State*, 686 N.E.2d 791, 793 (Ind. 1997). The admission or exclusion of evidence will not generally be reversed on appeal absent a manifest abuse of discretion that results in a denial of a fair trial. *See Becker v. State*, 695 N.E.2d 968, 973 (Ind. Ct. App. 1998). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Myers v. State*, 718 N.E.2d 783, 789 (Ind. Ct. App. 1999), *trans. denied*. Moreover, this court will find an abuse of discretion when the trial court controls the scope of cross-examination to the extent that a restriction substantially affects the defendant's rights. *Nasser v. State*, 646 N.E.2d 673, 681 (Ind. Ct. App. 1995).

*Zawacki v. State*, 753 N.E.2d 100, 102 (Ind. Ct. App. 2001).

During trial, Aka's counsel questioned the victim about whether she had entered into a relationship with a new boyfriend. The State objected, claiming that "whether she has a new boyfriend or not is completely irrelevant" because the trial was taking place nearly nine months after Aka hit the victim in the head with the bicycle. Tr. p. 200. Aka's counsel stated that the evidence was relevant to show bias because it was the defense's position that the victim falsely accused Aka of battering her and that she began a relationship with another man shortly after Aka's arrest. The trial overruled the State's objection but indicated that it believed that the line of questioning was "very close to not being relevant." Tr. p. 201. The victim denied that she had a new boyfriend, but rather simply a male friend. The victim also denied that this male friend lived with her.

After the victim denied having a new boyfriend and living with him, Aka's counsel attempted to question the victim's neighbor, Naw Htoo, about whether the victim had a new live-in boyfriend. During the cross-examination of Naw Htoo, the following exchange and sidebar discussion occurred:

12

[The Defense]:    Since this incident or shortly after the incident, you've seen [the victim] in that apartment complex?

[Htoo]:    Yes, I did.

[The Defense]:    Okay, and shortly after this incident you've seen [the victim] with another man, is that right?

[The State]:    Objection, Judge. May we approach?

[The Court]:    You may.

(COUNSEL APPROACHES FOR SIDEBAR DISCUSSION)

[The State]:    Again, I'm saying this is not relevant to the testimony. In addition, we think this is improper impeachment because [the victim] did say she does have a male friend. So, for those reasons I would object.

[The Court]:    Ms. Turner?

[The Defense]:    Yes, Judge. I believe my question was shortly after the incident if she's seen him around the neighborhood with her, and the answer will be yes. My next question will be has [the victim] denied that she lived with this man, and she is going to say that -- she is going to impeach [the victim] and say, no that this guy is living there, has been living there since this incident.

[The State]:    And then Judge, we would say that that's impeachment on a collateral matter. It's not relevant to this case.

[The Court]:    Alright, is there anything else? Your objection is as to relevancy?

[The State]:    Yes, and improper impeachment.

[The Court]:    Okay.

[The Defense]:    I think it's relevant. It goes to -- it impeaches [the victim], and it goes to her credibility. It shows her motive to lie, bias.

[The Court]:    Okay, and you're talking about something after this incident, is that right?

[The Defense]:    Shortly thereafter, yes.

[The Court]:    Okay, alright. Step back please.

(END OF SIDEBAR DISCUSSION)

[The Court]:    The State's objection is sustained.

Tr. pp. 217-19.

Aka argues on appeal that the trial court abused its discretion in sustaining the State's objection to his counsel's line-of-questioning of Naw Htoo about whether the victim has a new live-in boyfriend because such evidence is relevant to show that the victim is biased

13

against Aka. Aka claims that such bias is relevant to his theory that the victim falsely accused him of battering her. The State, conversely, argues that the trial court properly sustained its objection because Naw Htoo's testimony regarding whether the victim had a new live-in boyfriend nine months after Aka battered the victim was not relevant to show bias, but rather amounted to an impermissible attempt to impeach the victim on collateral matters.

> Impeachment upon collateral matters is impermissible. *Jackson v. State*, 728 N.E.2d 147, 153 (Ind. 2000) (addressing that the common law rule preventing impeachment upon collateral matters was still valid following the adoption of the Indiana Rules of Evidence). The determination of whether a matter is collateral depends upon whether the offering party would be entitled to prove it as part of the case in chief, apart from the contradiction it supplies. *Andrews v. State*, 529 N.E.2d 360, 365 (Ind. Ct. App. 1988), *cert. denied* 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). In other words, the question is whether the evidence is admissible for any purpose independent of the contradiction of the witness. *Id.* A party may inquire into a collateral matter on cross-examination. *Highley v. State*, 535 N.E.2d 1241, 1243 (Ind. Ct. App. 1989), *trans. denied.* However, the questioner is bound by the answer received and may not impeach the witness with extrinsic evidence unless the evidence would be independently admissible. *Id.* When evidence is used in a manner solely to prejudice a jury against the witness and is not material to the litigation, the evidence is referred to as an "evidentiary harpoon" and its admission is improper. *Henson v. State*, 530 N.E.2d 768, 770 (Ind.Ct.App.1988), *trans. denied.*

*Kien v. State*, 782 N.E.2d 398, 409 (Ind. Ct. App. 2003). However, "[e]vidence of bias, prejudice, or ulterior motives on the part of a witness is relevant at trial, as it may discredit the witness or affect the weight of the witness's testimony." *Zawacki*, 753 N.E.2d at 102 (citing Ind. Evidence Rule 616; *Sigler v. State*, 733 N.E.2d 509, 511 (Ind. Ct. App. 2000), *trans. denied*).

14

At best, Naw Htoo's testimony was marginally relevant to show bias and we conclude that the trial court's exclusion of Naw Htoo's testimony regarding whether the victim had a new live-in boyfriend was, at most, harmless. Aka argues that the evidence was relevant to prove that the victim was biased against him and falsely accused him of battering her. However, the victim's testimony regarding Aka's attack on her was corroborated by the testimony of Aka and the victim's twelve-year-old daughter who testified that she, apparently unbeknownst to both Aka and the victim, saw Aka strike the victim in the head with the bicycle. As such, we conclude that Aka has failed to demonstrate that the trial court abused its discretion in this regard.

### IV. Whether the Trial Court Abused its Discretion in Admitting Inadmissible Hearsay During Trial

Aka next contends that the trial court abused its discretion in admitting inadmissible hearsay into evidence. Specifically, Aka claims that the trial court erroneously allowed Laura Hobbs, the forensic nurse examiner who examined the victim in the hospital emergency room, to testify about out-of-court statements made by the victim. The State, for its part, claims that the victim's statements to Hobbs fell under the "medical diagnosis exception" to the hearsay rule set forth in Indiana Evidence Rule 803(4).

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered to prove the truth of the matter asserted. *Nash v. State*, 754 N.E.2d 1021, 1023 (Ind. Ct. App. 2001) (citing Ind. Evidence Rule 801(c)). Hearsay is inadmissible unless admitted pursuant to a recognized exception. *Id.* (citing Evid. R. 802). "Indiana Evidence Rule 803(4)

15

sets forth the 'medical diagnosis exception' to the hearsay rule." *Perry v. State*, 956 N.E.2d 41, 49 (Ind. Ct. App. 2011). "Rule 803(4) provides for the admissibility of statements 'made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.'" *Id.* (quoting Evid. R. 803(4)). "The rationale underlying the exception is that a declarant's self-interest in seeking treatment reduces the likelihood that she will fabricate information that she provides to those who treat her." *Id.* (citing *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)).

"In determining the admissibility of hearsay under Rule 803(4), courts evaluate (1) whether the declarant's motive was to provide truthful information to promote diagnosis and treatment and (2) whether the content of the statement is such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment." *Id.* (citing *In re Paternity of H.R.M.*, 864 N.E.2d 442, 446 (Ind. Ct. App. 2007)). "Statements attributing fault or establishing a perpetrator's identity are typically inadmissible under the medical diagnosis exception, as identification of the person responsible for the declarant's condition or injury is often irrelevant to diagnosis and treatment." *Id.* (citing *Beverly v. State*, 801 N.E.2d 1254, 1259 (Ind. Ct. App. 2004), *trans. denied*). However, we have noted that in cases involving child abuse, sexual assault, and/or domestic violence, courts may exercise their discretion in admitting medical diagnosis statements which relay the identity of the perpetrator. *Id.* (citing *Nash*, 754 N.E.2d at 1024-25); *see also Dowell v. State*, 865 N.E.2d 1059 (Ind. Ct. App.

16

2007), *summarily aff'd in relevant part*, 873 N.E.2d 59 (Ind. 2007).

In *Nash*, we considered whether the statement given by the victim of domestic sexual

abuse to a nurse who examined the victim. 754 N.E.2d at 1023-25. As we recognized in

*Nash*:

> All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser. The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household. In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes "reasonably pertinent" to the victim's proper treatment.

*Id*. at 1025 (quoting *United States v. Joe*, 8 F.3d 1488, 1494-95 (10th Cir. 1993)). We

believe that the same can be said of all victims of domestic abuse, and would expand our

conclusion in *Nash* to encompass all victims of domestic abuse, not only victims who suffer

domestic abuse of a sexual nature.

> "The extent to which a statement as to cause is pertinent to diagnosis or treatment rests within the discretion of the trial judge, who may consider the health care provider's testimony in making that determination." 13 Robert Lowell Miller, Jr., Indiana Practice: Indiana Evidence § 803.104 (3d ed. 2007) (citations omitted); *see also* Ind. Evidence Rule 104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the Court[.]"); 21A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5053.3 (2d ed. 2005) ("The judge determines the preliminary facts regarding the hearsay exceptions in Rule 803[.]").

*Perry*, 956 N.E.2d at 50. "An abuse of discretion occurs if a trial court's decision is clearly

17

against the logic and effect of the facts and circumstances before the court." *Lehman v. State*, 926 N.E.2d 35, 37 (Ind. Ct. App. 2010), *trans. denied*. "However, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected." *Id*. "Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Id*.

During trial, Hobbs testified about her duties as a forensic nurse examiner and that her examination of a victim of domestic violence is relevant to the diagnosis and treatment of her patient. Specifically, Hobbs engaged in the following exchange upon direct examination by the State:

> [Hobbs]: A forensic nurse examiner is staffed through the emergency department as well as on call, and we help the emergency room nurses until we're consulted by a nurse or a physician to see a patient for a forensic medical exam.
> [The State]: What is a forensic medical exam?
> [Hobbs]: A forensic medical exam is for patients that have been in trauma, assaulted, sexual assault, physical assault, child abuse, domestic violence. And we see them to take a thorough history and do a thorough physical exam, as well as document injuries, that which may include photography, collect evidence.
>
> ****
>
> [The State]: Is a domestic related assault relevant to the diagnosis and treatment of the patient?
> [Hobbs]: Yes, it is important to know whether a patient has a safe place to go home. There's also psychological and emotional issues that domestic violence patients face that are different than some of our other patients, and we like to try to address those while we have the opportunity in the emergency room.
> [The State]: Okay, is a detailed knowledge of the incident that caused the patient to come to the hospital important for diagnosing and treating a patient?

18

[Hobbs]:     Yes.

Tr. pp. 78, 83.

With respect to the victim in the instant matter, Hobbs testified as follows:

Well, first we asked her how she obtained her injuries, and that's when I talked to her about what services I can offer with the forensic medical examination, collecting forensic evidence, taking photographs, and doing a thorough history and physical of what happened that evening, and she agreed. And so I then talked to her in-depth … asking her about the incidents that happened, and why she was here, and then based on her answers, I did a thorough physical exam and documented the injuries on the chart and as well as photo documentation.

Tr. p. 85. Hobbs further testified that during this examination, the victim told her about how she had sustained the injury to her head. Specifically, Hobbs testified that the victim told her that "her husband had come home and was angry, and had tried to hit her over the head twice with a child's bicycle, and she had tried to defend herself, and then went to the neighbor's house and called the police." Tr. p. 103.

In *Nash*, we concluded that the victim's statement to the emergency room nurse identifying the defendant as her attacker was pertinent to the nurse's examination of the victim and the emergency room staff's course of treatment of the victim. 754 N.E.2d at 1025. Likewise, in *Perry*, we concluded that the victim's statement to the emergency room nurse identifying the defendant as her attacker was pertinent to the diagnosis and treatment of the victim's injuries. 956 N.E.2d at 50.

In the instant matter, similar to the conclusions in *Nash* and *Perry*, we conclude that the victim's statements to Hobbs were pertinent to the diagnosis and treatment of the victim's injuries. The victim's statements were also pertinent to recommendations by the emergency

19

room staff for potential future psychological treatment, as well as to the determination as to whether the victim had a safe place to go upon her release from the hospital. As such, we conclude that the victim's statements to Hobbs were not inadmissible hearsay because the statements fell under the "medical diagnosis exception" to the hearsay rule set forth in Rule 803(4).

## CONCLUSION

In sum, we conclude that the trial court acted within its discretion in allowing the jury to begin deliberations in the evening hours, and that the trial court acted within its discretion in finding M.N.F. competent to testify at trial. We also conclude that the trial court acted within its discretion in limiting the scope of Naw Htoo's testimony and in allowing Hobbs to testify about statements made to her by the victim during Hobbs's examination of the victim in the emergency room. Accordingly, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.

20