## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 21 2020, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Chad A. Montgomery
Montgomery Law Office
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Blake Green,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

August 21, 2020

Court of Appeals Case No.
19A-CR-2791

Appeal from the Tippecanoe
Superior Court

The Honorable Steven P. Meyer,
Judge

Trial Court Cause No.
79D02-1810-F1-12

**Brown, Judge.**

Blake Green appeals his convictions for rape, burglary, and criminal confinement. Green argues the trial court improperly admitted certain testimony and the evidence is insufficient to show he committed the offenses while armed with a deadly weapon. The State claims the court erred in reducing the level of felony for Green's burglary and criminal confinement convictions. We affirm in part, reverse in part, and remand.

### Facts and Procedural History

In September 2018, N.G. lived with her two children in a house in Clarks Hill. At some point after 11:00 p.m. on September 11, 2018, N.G. and her children watched a movie in the living room, and the children fell asleep. N.G. double-checked that the door was locked and fell asleep between midnight and 1:00 a.m. N.G. woke up, opened her eyes, and saw Green in her living room.[1] She observed Green staring at her and holding a silver semi-automatic handgun. The television was on in the living room and the lights were off. Green ordered N.G. to "get up and go" and not to make any noise. Transcript Volume II at 177. He pushed her through the hallway and into her daughter's bedroom. N.G. noticed the gun was closer to her and saw it had black on it as well as silver. Green ripped N.G.'s tank top off of her, removed her pants and underwear, pushed her onto the bed, and forced her to suck on his penis. He then pushed her backwards, climbed on top of her, and shoved his penis in her

---

[1] N.G. testified that she had never spoken with or spent time with Green but that she had seen him in passing around Clarks Hill.

mouth. He "was forcing it . . . so hard that [she] couldn't breathe," she tried to push him off, and he "just force[d] it back and said 'No.'" *Id.* at 181. Green held the gun in his hand and pointed it at N.G.'s temple. After a few minutes, he "pulled it out and stuck it inside of [her] vagina." *Id.* While Green was having sexual intercourse with her, N.G. "begged him" not to ejaculate "inside of [her] because [she] said [she] already lost a child due to a piece of crap," and Green "got angry and started to choke [her] and said 'Are you calling me a piece of crap.'" *Id.* at 184. He kept saying "[t]ell me you love me." *Id.* Green ejaculated while having sexual intercourse with N.G. According to N.G., there was a point when he placed the gun down on the bed, it fell between the bed and the wall, he picked it up again "after he was finished," and "other than that, he had it in his hands." *Id.* at 185.

[3] N.G. told Green she needed to use the restroom, and he walked her to the bathroom and did not allow her to turn on the lights. Green and N.G. returned to the bedroom where he tried to have intercourse with her again but was unable maintain an erection. Green told N.G. that he had been watching her and said, "I'm sorry it had to happen this way," "if I could have just met you up at Clarks Hill Park and told you who you were, you'd want to be with me," and "maybe since you haven't seen my face and only heard my voice, maybe [] that's still a possibility." *Id.* at 184.

[4] N.G. told Green she wanted to take a bath, and he took her to the bathroom but did not let her turn on the lights. While she was sitting in the tub, Green ordered her to stand and face the wall, he turned on the light and stood behind

her, she observed a tattoo on his leg, he had intercourse with her again, she begged him not to ejaculate inside her, and he ejaculated on her back and butt. N.G. sat back down in the tub. Green said "reach your fingers way up in there and try to scrape out anything that's in there." *Id*. at 186. Green ordered N.G. to count to one hundred and to turn around. He told her that, if she went to the police, he would kill her brother and father and return to kill her. After Green left, N.G. contacted her manager, brother, and father, and her father's girlfriend contacted law enforcement.

[5] N.G. went to the hospital, where Cathy Clark, a sexual assault nurse examiner, ("Nurse Clark") performed a sexual assault examination. As part of the examination, N.G. described the attack to Nurse Clark. DNA testing was performed on swabs obtained during N.G.'s examination and from Green. The testing revealed that the DNA profile with respect to each of the vaginal/cervical swabs, anal swabs, and internal genital swabs was "at least one trillion times more likely if it originated from [N.G.] and [Green] than if it originated from [N.G.] and an unknown, unrelated individual" and that "[t]his analysis provides very strong support for the proposition that [Green] is a contributor to the DNA profile." State's Exhibit 45.

[6] On October 17, 2018, the State charged Green with: Count I, rape by using or threatening the use of deadly force or while armed with a deadly weapon as a level 1 felony; Count II, burglary while armed with a deadly weapon as a level 2 felony; Count III, criminal confinement while armed with a deadly weapon as

a level 3 felony; Count IV, strangulation as a level 6 felony; and Count V, residential entry as a level 6 felony.

[7]     During the jury trial, N.G. testified to the foregoing. The prosecutor asked Nurse Clark to summarize N.G.'s statement about the events leading to her hospital visit, and Green's defense counsel objected on hearsay grounds. The prosecutor argued the testimony was admissible under Ind. Evidence Rule 803(4). Defense counsel argued that anything beyond diagnosis and treatment was not admissible under Ind. Evidence Rule 803(4) and the testimony was repetitive of N.G.'s testimony. The court overruled the objection. Nurse Clark testified:

> So [N.G.] said she was on her couch asleep. Her two children were also asleep on the floor. And she was awakened by somebody yelling at her very - with profanity, to get up, and also he had a gun in his hand. He then walked her back down the hall into her daughter's bedroom. And on the way into the daughter's bedroom, she reported that he ripped off her white tank top that also had sequins on it. And then once he got her into the daughter's bedroom, he took off her jogging pants and her underwear, and he then sexually assaulted her by putting his penis in her mouth and also in her vagina, and also trying to get his penis in his - in her anus, as well. And he did this more than once.

> He also - after a while, he then took her down the hall and had her get into a tub of water because he said, I want you to wipe off any evidence of me. And then she got into the water and cleaned herself all off. And then he also sexually assaulted her in the bathroom with putting his penis in her mouth, and again, in her vagina in the bathroom, in the bathtub, then pushed her back down in the water and made her get washed again.

> And then - also, he never allowed any lights on, and he told her that she needed to stay in the water and count to 100. And if she didn't, he

would kill her. He talked about also threatening her mother and father and brothers as well. And so she did it. She stayed in the bathtub and counted to 100 until he was gone.

Transcript Volume III at 76. Nurse Clark testified she performed a head-to-toe examination of N.G., documented her injuries, and photographed N.G.'s arm which showed discoloration and bruising and her neck where she reported she was strangled which showed discoloration and redness. She testified regarding the genital exam she performed and that N.G. sustained a tear on her vaginal wall. Nurse Clark testified that she collected swabs based on N.G.'s history and performed swabs of the inner and outer areas of N.G.'s genitalia as well as her breasts.

[8] The jury found Green guilty as charged on all counts. The court entered judgments of conviction for rape as a level 1 felony under Count I, burglary as a level 4 felony under Count II; criminal confinement as a level 6 felony under Count III; and strangulation as a level 6 felony under Count IV. The court stated that it reduced the level of felony for the burglary and criminal confinement convictions because they had been elevated based on "the same enhancement that's used in the rape case," and "I can only use one enhancement." *Id*. at 243. The court vacated Green's conviction for residential entry under Count V. The court sentenced Green to forty years on Count I, eight years with five years suspended to supervised probation on Count II, and two years each on Counts III and IV. It ordered that the sentences on Counts I,

II and IV be served consecutively for an aggregate sentence of fifty years with five years suspended.

## *Discussion*

### I.

[9] The first issue is whether the trial court abused its discretion in admitting certain testimony from Nurse Clark. We generally review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We may affirm a trial court's decision if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[10] Green argues the trial court abused its discretion when it permitted Nurse Clark to testify as to N.G.'s statements to her at the hospital. Green cites Ind. Evidence Rule 801(d)(1).[2] The State responds that Nurse Clark's testimony was

---

[2] Ind. Evidence Rule 801(d) provides in part:

> Notwithstanding Rule 801(c), a statement is not hearsay if:
>
> (1) *A Declarant-Witness's Prior Statement*. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

admissible under Ind. Evidence Rule 803(4) and that any error was harmless as the testimony was substantially the same as N.G.'s testimony.

[11] Ind. Evidence Rule 801(c) provides that hearsay means a statement that is not made by the declarant while testifying at the trial or hearing and is offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 802 provides that hearsay is not admissible unless the rules or other law provides otherwise. Ind. Evidence Rule 803 provides in part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> * * * * *
>
> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>
> (A) is made by a person seeking medical diagnosis or treatment
>
> (B) is made for – and is reasonably pertinent to – medical diagnosis or treatment; and
>
> (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause.

---

(A) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

(B) is consistent with the declarant's testimony, and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

(C) is an identification of a person shortly after perceiving the person.

"The rationale underlying the exception is that a declarant's self-interest in seeking treatment reduces the likelihood that she will fabricate information that she provides to those who treat her." *Perry v. State*, 956 N.E.2d 41, 49 (Ind. Ct. App. 2011) (citation omitted), *reh'g denied*. In determining the admissibility of hearsay under Ind. Evidence Rule 803(4), courts evaluate (1) whether the declarant's motive was to provide truthful information to promote diagnosis and treatment and (2) whether the content of the statement is such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment. *Id*. "The extent to which a statement as to cause is pertinent to diagnosis or treatment rests within the discretion of the trial judge, who may consider the health care provider's testimony in making that determination." *Id*. at 50 (citation omitted).

[12] The record reveals that N.G. was at the hospital and made her statements to Nurse Clark as part of a sexual assault examination. Nurse Clark testified that sexual assault examinations are "individualized based on [the patient's] history." Transcript Volume III at 65. She testified that, as part of the exam, she took "a history of what brought" N.G. to the hospital and N.G. gave her "a history of everything that occurred on September 12th, prior to coming in, and I'm documenting that in the electronic medical record." *Id*. at 71. N.G.'s statement described the assault against her and related her medical condition and injuries and their inception and general cause. Based upon the record, we cannot say the trial court abused its discretion in admitting the challenged statements pursuant to the hearsay exception under Ind. Evidence Rule 803(4).

*See Perry*, 956 N.E.2d at 50 (concluding that the victim's statements indicating she was grabbed around the neck and strangled were pertinent to the diagnosis and treatment of her injuries and admissible under Ind. Evidence Rule 803(4)). Further, errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party. *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996); Ind. Trial Rule 61. In determining whether error in the introduction of evidence affected the defendant's substantial rights, this court must assess the probable impact of the evidence upon the jury. *McClain*, 675 N.E.2d at 331. The testimony of Nurse Clark regarding N.G.'s statements to her was cumulative of N.G.'s testimony, and any error in the admission of N.G.'s statements through Nurse Clark's testimony was harmless. *See id*. (finding any error in admitting a therapist's testimony was harmless where it was merely cumulative of the declarant's statements made on the stand).

## II.

[13] The next issue is whether the evidence is sufficient to prove that Green committed his offenses while armed with a deadly weapon. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the verdict. *Id.* We affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to

support the verdict. *Id*. The uncorroborated testimony of one witness can be sufficient to sustain a conviction. *Ferrell v. State*, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

[14] Green argues the evidence is insufficient to prove he "committed the offenses of rape, burglary, and criminal confinement while armed with a deadly weapon." Appellant's Brief at 12. He argues no firearm was ever discovered and no lights were on in the house. He asserts that "[t]he testimony is only what N.G. testified to – the intruder had a 'gun' which was (1) not a revolver and (2) had a little bit of black on it besides the silver" and "there is no evidence or testimony of how this 'gun' was in fact a 'gun' or firearm within the definition of Indiana Code 35-47-1-5." *Id*. at 20.

[15] The offense of rape is a level 1 felony if it is committed by using or threatening the use of deadly force or it is committed while armed with a deadly weapon, *see* Ind. Code 35-42-4-1, the offense of burglary is a level 2 felony if it is committed while armed with a deadly weapon, *see* Ind. Code § 35-43-2-1, and the offense of criminal confinement is a level 3 felony if it is committed while armed with a deadly weapon. *See* Ind. Code § 35-42-3-3. Ind. Code § 35-31.5-2-86 provides in part that a "deadly weapon" means "(1) A loaded or unloaded firearm" or "(2) A destructive device, weapon, device, taser [] or electronic stun weapon[, or] equipment . . . that in the manner it [] is used; [] could ordinarily be used; or [] is intended to be used . . . is readily capable of causing serious bodily injury." Ind. Code § 35-47-1-5 provides that a firearm is any weapon

that is capable of expelling or designed to expel, or that may readily be converted to expel, a projectile by means of an explosion.

[16] In order to prove that a weapon was used in the commission of a crime, it is not necessary to introduce the weapon into evidence at trial. *Gorman v. State*, 968 N.E.2d 845, 850 (Ind. Ct. App. 2012) (citing *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009)), *trans. denied*. There must be some proof that the defendant was actually armed with a deadly weapon at the time of the crime; it is not enough if a victim merely feared that the defendant was armed with a deadly weapon, but no such weapon was shown or displayed and/or the defendant made no statements that he or she was armed. *Id*. at 850-851. However, "a victim's testimony that he or she saw the defendant use what was believed or 'figured' to be a gun is, by itself, sufficient proof of the use of a deadly weapon." *Id*. at 850 (citing *Harvey v. State*, 542 N.E.2d 198, 200-201 (Ind. 1989)).

[17] The evidence most favorable to the verdicts is that Green possessed and used a deadly weapon during the commission of his crimes. N.G. testified that she woke up and observed Green staring at her and holding a gun. She testified that the television was on and there was enough light for her to identify Green. She testified she could "tell it [the gun] was silver," "[i]t was a handgun," she knew the difference between a semi-automatic and a revolver, and "[i]t was a semi – it wasn't a revolver." Transcript Volume II at 177. When asked "[w]hen you went down that hallway, were you able to notice anything else about the Defendant or his gun," she testified "the gun was closer to me, so I could see a little bit of black on it besides the silver." *Id*. at 178. She testified

that Green pushed her backwards, climbed on top of her, and shoved his penis into her mouth, and when asked "[w]here was the gun at this point," she testified: "In his hand.  It was pointed towards my temple right here."  *Id*. at 181.  When asked "[w]hen you were still in the bedroom, did the Defendant have the gun the whole time" and "[w]as there any time he put it down," N.G. answered: "He did.  There was a point in time where he had put it down on the bed, and you could hear it slide down the wall, like, it had fell between the bed and the wall and then slid down, and you could hear it kind of hit the floor.  But other than that, he had it in his hands."  *Id*. at 185.  When asked "[d]id he pick it up at any point," she answered "[h]e did after he was finished."  *Id*.  Nurse Clark testified that N.G. told her that, when she was awakened, Green had a gun in his hand.  When asked on cross-examination "she didn't specify whether it was a cap gun, pellet gun, airsoft gun" and "[s]he just used the term 'gun,' correct," Nurse Clark testified: "she called it, '[h]is .45.'"  *Id*. at 90.

[18]     The jury was able to assess witness credibility and consider the testimony.  Based upon the record, we conclude that evidence of probative value exists from which the jury as the trier of fact could find beyond a reasonable doubt that Green committed his crimes while armed with a deadly weapon.  *See Gorman*, 968 N.E.2d at 850-851 (observing the defendant argued the purported gun used during a robbery was never recovered and the evidence did not show he possessed a functioning firearm or deadly weapon as opposed to possibly a toy, noting one of the victims indicated the robber possessed what looked like a 9mm semiautomatic handgun and the trier of fact could weigh any

discrepancies between the witnesses' testimony, and holding the testimony by itself was sufficient to prove the defendant committed the robberies while armed with a deadly weapon).

III.

[19] The next issue is whether the trial court erred in reducing the level of felony for Green's convictions for burglary and criminal confinement. The State contends that elevated convictions for rape, burglary, and criminal confinement do not violate Indiana's prohibition against double jeopardy because he possessed the weapon during the burglary and used the weapon during the rape and criminal confinement of the victim.

[20] Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." The Indiana Supreme Court has established that the use of a single deadly weapon during the commission of separate offenses may be used to enhance the level of each offense and does not result in a violation of the Indiana Double Jeopardy Clause. *See Sistrunk v. State*, 36 N.E.3d 1051, 1054 (Ind. 2015) (observing that the use of a single deadly weapon during the commission of separate offenses may enhance the level of each offense); *Gates v. State,* 759 N.E.2d 631, 633 n.2 (Ind. 2001) ("It is well established in Indiana that the use of a single deadly weapon during the commission of separate offenses may enhance the level of each offense."); *Leggs v. State,* 966 N.E.2d 204, 209 (Ind. Ct. App. 2012)

(holding that the defendant "was not subjected to double jeopardy when he was convicted of multiple crimes enhanced by the use of a knife").

[21] The jury found that Green possessed a handgun when he broke into and entered N.G.'s home. The evidence shows that Green held the gun in his hand when he ordered N.G. to the bedroom and that he pointed the gun at her temple when he forced his penis into her mouth. N.G. testified that Green placed the gun on the bed at one point and that it slid to the floor, he picked it back up when "he was finished," and "other than that, he had it in his hands." Transcript Volume II at 185. During closing argument, the prosecutor argued that Green held a gun against N.G.'s temple which supported a finding he was armed with a deadly weapon under Count I, he had a deadly weapon when he broke in and entered which supported the charge under Count II, and he confined her in the bedroom and bathroom and she could not leave because of his threats and the gun which supported the charge under Count III. The court instructed the jury on the elements of each charged offense and the definitions of deadly weapon and firearm.

[22] The record supports the findings that Green committed the offenses of rape, burglary, and criminal confinement while armed with a deadly weapon, and the testimony demonstrates that, in each instance, the threat from the gun was distinct. On the facts in this case, the fact the offenses were committed while armed with a gun or the same gun does not require the reduction of the level of felony of any of the convictions on double jeopardy grounds. Accordingly, we remand with instructions to enter Green's convictions for burglary as a level 2

felony and for criminal confinement as a level 3 felony and to enter a new sentencing order.

[23] Affirmed in part, reversed in part, and remanded.

Robb, J., and Crone, J., concur.